Filed 3/17/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JAKLIN MIKHAL ROMINE, | B239761 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC386031) |
| v. | |
| JOHNSON CONTROLS, INC. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jan A. Pluim, Judge. Affirmed in part, reversed in part, and remanded.

Reed Smith, Margaret M. Grignon, Anne M. Grignon, for Defendants, Appellants, and Cross-Respondents Johnson Controls, Inc. and Hoover Universal, Inc.

Bisnar | Chase, Brian D. Chase, Scott Ritsema, and Jill P. McDonell for Plaintiff, Respondent, and Cross-Appellant Jaklin Mikhal Romine.

## INTRODUCTION

A vehicle traveling at a high rate of speed slammed into a line of vehicles stopped at an intersection, thus propelling a vehicle into the back of plaintiff Jaklin Romine's Nissan Frontier pickup truck. The force of the collision caused plaintiff's seatback to collapse and plaintiff to slide up the seat. Plaintiff's head struck her vehicle's back seat, and she suffered spinal injuries that rendered her a quadriplegic. Plaintiff brought an action for her injuries against various persons and entities including the only remaining defendants at trial, Ikeda Engineering Corporation (Ikeda), which participated in the design of her vehicle's seat, and Vintec Co. (Vintec), which manufactured her vehicle's seat.[1] Plaintiff tried her strict products liability action to a jury on a consumer expectations design defect theory. The jury returned a verdict in plaintiff's favor in the amount of $24,744,764, and found that defendants were 20 percent at fault for her injuries. After offsets for settlements with other defendants and an award of costs to plaintiff, the trial court entered judgment for plaintiff in the amount of $4,606,926.68.

On appeal, defendants contend that the trial court erred in permitting plaintiff to try her strict products liability action under the consumer expectations design defect test rather than under the risk/benefit design defect test; the component parts doctrine precluded a finding of strict products liability against defendants; Ikeda, as a provider of engineering services, could not be held strictly liable for a product it designed but did not manufacture, sell, or otherwise place in the stream of commerce; the trial court improperly excluded evidence in connection with the apportionment of fault among other manufacturers; and the trial court erred in permitting plaintiff to introduce evidence of the full amount billed for her past medical care rather than the amount her medical care providers accepted. Plaintiff also appeals, asserting that the trial court erred in failing to

---

[1] The named defendant at trial, Johnson Controls, Inc., parent of Hoover Universal, Inc., which was the successor in interest to Vintec and Ikeda, stipulated to be legally responsible to pay damages due to the acts of Vintec or Ikeda. Reference to "defendants" in this opinion includes Vintec; Ikeda; Johnson Controls, Inc.; and Hoover Universal, Inc.

award her expert witness fees pursuant to Code of Civil Procedure section 998 and prejudgment interest pursuant to Civil Code section 3291.

Because Ikeda could not be held strictly liable for engineering services it provided and the trial court erred in barring defendants from apportioning fault for plaintiff's injuries to other manufacturers, we reverse the judgment and remand the matter for a retrial limited to the issue of apportionment of fault. The jury's finding of defendants' liability, except as to Ikeda, and its finding that plaintiff suffered damages of $24,744,764 are affirmed and are not to be a part of the retrial.

## BACKGROUND

Raymond Gallie exited the 210 Freeway at a high rate of speed in his Ford Mustang. Plaintiff and her boyfriend were stopped in plaintiff's Frontier in a line of automobile traffic at a red light on a street at the end of the freeway off-ramp—plaintiff was in the driver seat and her boyfriend was in the passenger seat. A Volvo was in the front of the line, a Mercedes was behind the Volvo, plaintiff's Frontier was behind the Mercedes, and a Nissan Altima was behind plaintiff's Frontier.

The Mustang hit the rear of the Altima, starting a chain reaction of collisions. A collision pushed the Altima into the rear of plaintiff's Frontier, which was pushed into the rear of the Mercedes, which was pushed into the rear of the Volvo, which came to a rest in the intersection. The Mustang was traveling between 70 and 86 miles per hour when it hit the Altima. The Altima was propelled forward at a speed of between 42 and 43 miles per hour when it hit plaintiff's Frontier. Plaintiff's Frontier was propelled forward at a speed of between 24 and 27 miles per hour when it was struck by the Altima. The Mercedes, which was severely damaged when struck by plaintiff's Frontier, was propelled forward at a speed of 18 miles per hour.

Plaintiff was wearing her seat belt at the time of the accident. Plaintiff's seat fell back when her Frontier was struck from behind. After the accident, plaintiff tried to move but could not. When the fire department paramedics arrived, the position of plaintiff's seat was reclined. Plaintiff was in the "supine position"—reclined and facing

3

forward or up. Plaintiff said that she could not feel her legs, had no sensation from her waist down, and had no sensation or had numbness on both sides of her body. A paramedic concluded that plaintiff had a spinal injury.

Plaintiff was taken to the hospital where she was diagnosed with two broken and two dislocated vertebrae in her neck. Plaintiff underwent surgery after which she still could not move. The doctors told her that she would not be able to walk again. Over time, with physical therapy, plaintiff regained some functioning in her hands. She could not move her fingers, but could grasp things with two hands.

Plaintiff filed an action for injuries she suffered in the rear-end collision. She alleged three causes of action: (1) strict products liability against Nissan Motor Co., Ltd; Nissan North America, Inc.; Nissan Design American, Inc., and Nissan Technical Center North America, Inc. (subsequently added by Doe amendment) (the Nissan defendants); (2) negligent products liability against the Nissan defendants; and (3) negligence and negligent entrustment against the estate of Christopher Clark, the driver of the vehicle that struck plaintiff's Frontier, and Diane Kornman, who owned and permitted Clark to use the vehicle that struck plaintiff's Frontier. Plaintiff added by Doe amendments Johnson Controls, Inc.; Ikeda; Vintec; Autoliv ASP, Inc., which designed and manufactured the Frontier's seat belts; and Faurecia Automotive Seating, Inc. and Faurecia NA SPG, one of which manufactured the recliner mechanism in the Frontier's driver's seat.

According to the judgment, prior to trial, plaintiff settled with Gallie, Clark's estate, the Nissan defendants, the "Autoliv defendants," and Faurecia Automotive Seating.[2] Plaintiff elected to proceed at trial solely on her strict products liability cause of action.

---

[2] The parties' briefs on appeal do not inform us of Kornman's or Faurecia NA SPG's ultimate status in the action—i.e., whether they extricated themselves by some procedural device or settled with plaintiff. It is unclear from the record whether there was more than one "Autoliv" entity. Defendants state that plaintiff settled with Gallie before bringing this action—i.e., Gallie was never a defendant in the action.

Steven Meyer, plaintiff's accident reconstruction expert, testified that when a vehicle is struck from behind and the vehicle's seat falls down, the seat's occupant will move up the back of the seat or "ramp" towards the back of the vehicle. As the seat lies down, two things happen with respect to the seat belt—the hips of the seat's occupant rotate slightly causing the lap belt to loosen allowing the occupant to slide up and under the lap belt, and the shoulder belt becomes slack and loose. As the occupant moves rearward, the shoulder belt is no longer operative—i.e., it provides no resistance as the occupant moves away from and not into the shoulder belt. Meyer opined that when plaintiff's Frontier was struck from behind, plaintiff's seat "deflected" rearward and away from the shoulder belt, which slackened by six inches, and the lap belt, which slackened by two inches. Meyer explained that the type of latch plate on plaintiff's seat belt—the part that is inserted into the seat belt's buckle—allowed the seat belt to slide through the latch plate thus permitting the slack in the shoulder belt to combine with the slack in the lap belt. The lap belt could not prevent "ramping" because it could not stay tight either due to hip rotation or looseness in the shoulder belt. Meyer concluded that the seat belt, in the configuration in plaintiff's Frontier, could not prevent a driver from "ramping."

Dr. Kenneth Saczalski, plaintiff's structural engineering expert, testified that he inspected the driver's seat in plaintiff's Frontier. The seat had a two-part recliner consisting of the outboard recliner—the recliner closest to the door, and the inboard recliner—the recliner closest to the console. The recliners had lower brackets that attached to the seat cushion frame and upper brackets that attached to the seatback frame. The recliners had gears that allowed the seatback to be adjusted and held the seatback in place—i.e., from going backwards. The recliners contained a "locking pawl"—a set of small gears that engaged with another gear, the sector gear, to hold the seatback in place. Some of the teeth on the locking pawl on the inboard recliner of plaintiff's seat were broken off, thus allowing the gears to move without staying locked in place and allowing the seatback to fall backwards. The gears on the outboard locking pawl showed similar damage and were out of alignment. Dr. Saczalski opined that the accident caused those conditions. On cross examination, he testified that he would not expect the "release of

5

the teeth" as "one of the expected modes of release at the maximum moment"; instead he would expect damage and deformation in the seat's frame structure.

Dr. Saczalski conducted a crash test "to replicate a substantially similar rear impact from a force and energy point of view as what [plaintiff's] vehicle experienced in this accident." He used a 110 pound dummy in the test—i.e., a dummy that was lighter than plaintiff[3] because he wanted to determine how the seat would perform with a lighter occupant under the same impact severity. He was performing a conservative analysis of how the seat would perform under the same conditions. The recliner in the test broke in a manner similar to the manner in which the recliner in plaintiff's Frontier seat broke—the teeth on the locking pawl broke off and the locking pawl could not hold the sector gear. Although the dummy was wearing a lap belt, as the seat cushion compressed, the dummy's buttocks moved in and up the seat. That is, Dr. Saczalski testified that the dummy "ramped" up the seat.

Dr. Joseph Burton, plaintiff's expert on biomechanics (effect of forces on organic bodies), kinematics (how objects behave when a force acts on them), and forensic pathology in car accidents, testified that the primary force on plaintiff's head that caused her injuries was downward. As plaintiff had no significant head injuries, in order to injure her neck as she did, something had to stop her head without seriously injuring it. Dr. Burton stated that she would have suffered the neck injuries if her seatback reclined, her torso moved backward, and the seatback behind her stopped her head. He further opined that plaintiff would not have received the same types of injuries if her seat had remained upright. According to Dr. Burton, in a rear-end collision, when the seat collapses, a shoulder belt does not do anything and the lap belt remains in place. Dr. Burton testified that the accident was within the one to five percent most severe rear-end accidents.

David Brow, Johnson Controls, Inc.'s Engineering Director of the Nissan Business Unit in North America, testified that Johnson Controls provided its customer Nissan with

---

[3] Plaintiff's boyfriend estimated that plaintiff weighed between 180 and 190 pounds at the time of the accident.

seat products. Ikeda, an engineering company, designed and Vintec manufactured the seats for the Frontier. Ikeda did not manufacture the seat or any parts for the seat, and did not sell the seat. The primary components of the seat were its structural components: the back frame, cushion frame, recliner mechanism, and slide or track mechanism, which allowed the seat to move forward and backwards. Ikeda did not design the recliner, slide, or track mechanisms.

Randy Tighe, defendants' engineering expert, testified that the force of the accident significantly exceeded the design level of the Frontier's seat. Thus, the driver's seat performed in the accident as an engineer would expect it to perform. Catherine Corrigan, defendants' biomechanical engineering expert, testified that plaintiff sustained the injuries to her neck during the rear-end impact by the Altima.

The parties entered into the following stipulations that were presented to the jury:

(1) "Vintec manufactured the seat in the subject vehicle. Ikeda participated in the design of the seat in the subject vehicle."

(2) Johnson Controls, Inc. would be "legally responsible for paying any damages ultimately awarded to plaintiff based on the actions of Vintech [*sic*] or Ikeda."

(3) "All of the medical treatment received by plaintiff . . . from October 21st, 2006 to the present was reasonable and necessary to treat injuries legally caused by the accident . . . ."

(4) "The total medical bills for past medical [from the date of the accident to today's date] are $667,905 [*sic*]."

(5) "[T]here is no manufacturing defect in the 2000 Nissan Frontier Driver's seat at issue in this case. That means the seat met the plans and specifications applicable to that component part. The question of whether the design of the seat was defective remains at issue in this trial."

The jury returned a special verdict in plaintiff's favor. It awarded plaintiff $24,744,764 consisting of $6,744,764 in past and future economic damages, including $777,905 for medical expenses, and $18,000,000 in past and future non-economic damages. The jury allocated 20 percent of the fault for plaintiff's harm to defendants and

80 percent of the fault to Gallie. The award for past medical expenses was reduced from $777,905 to $462,608.68 by the stipulation of the parties. The trial court offset the judgment for pre-trial settlements with a resulting judgment against defendants of $4,444,042,68. Thereafter, the trial court awarded plaintiff $162,884 in costs for a total judgment against defendants of $4,606,926.68. The trial court denied plaintiff expert witness fees under Code of Civil Procedure section 998 and prejudgment interest under Civil Code section 3291 based on its finding that plaintiff did not receive a judgment more favorable than her settlement offer under Code of Civil Procedure section 998.

## DISCUSSION[4]

### I.      Plaintiff's Strict Products Liability Design Defect Claim

As noted above, plaintiff elected to proceed against defendants only on her strict products liability design defect claim. Defendants contend that the trial court erred in permitting plaintiff to try that claim under the consumer expectations test rather than the risk/benefit test because the consumer expectations test may not be used to evaluate "the performance of the design of a single part of a multi-component vehicle and restraint system in a violent, multi-vehicle car crash." Therefore, defendants maintain that the trial court erred in instructing the jury on the consumer expectations test and in excluding evidence relevant to the risk/benefit test. Defendants also argue that plaintiff failed to produce substantial evidence to meet the consumer expectations test. The trial court did not err, and plaintiff produced sufficient evidence.

#### A.      *Standards of Review*

We review de novo claims of instructional error. (*Mansur v. Ford Motor Co.* (2011) 197 Cal.App.4th 1365, 1373 [claimed error in failing to instruct a jury on the

---

**4**      Because we reverse the judgment and remand for a retrial on the issue of apportionment of fault, we need not address plaintiff's argument that the trial court erred in failing to award her expert witness fees pursuant to Code of Civil Procedure section 998 and prejudgment interest pursuant to Civil Code section 3291, as those issues depend on plaintiff's ultimate recovery from Johnson Controls, Inc.

8

consumer expectations test].)  A "trial court is 'vested with broad discretion in ruling on the admissibility of evidence.'  [Citation.]  '[T]he court's ruling will be upset only if there is a clear showing of an abuse of discretion.'  [Citation.]"  (*Tudor Ranches, Inc. v. State Comp. Ins. Fund* (1998) 65 Cal.App.4th 1422, 1431.)  We review the jury's findings of fact for substantial evidence.  (*Kelly v. CB&I Constructors, Inc.* (2009) 179 Cal.App.4th 442, 452.)  "Under the substantial evidence standard of review, we review the entire record to determine whether there is substantial evidence supporting the jury's factual determinations [citation], viewing the evidence and resolving all evidentiary conflicts in favor of the prevailing party and indulging all reasonable inferences to uphold the judgment [citation].  The issue is not whether there is evidence in the record to support a different finding, but whether there is some evidence that, if believed, would support the findings of the trier of fact.  [Citation.]"  (*Fariba v. Dealer Services Corp.* (2009) 178 Cal.App.4th 156, 170.)

> B.      *The Trial Court Properly Instructed the Jury on the Consumer Expectations*
>         *Test*

A manufacturer may be held strictly liable for its product if the plaintiff was injured while using the product in a reasonably foreseeable way.  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 560 (*Soule*); *Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1231 (*Saller*); see generally 6 Witkin, Summary of Cal. Law (10th ed. 2005) § 1428 et seq., p. 852 et seq. (Witkin).).  In order for there to be strict liability, the product does not have to be unreasonably dangerous—just defective.  (*Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 133.)  "Products liability may be premised upon a theory of design defect, manufacturing defect, or failure to warn.  (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995 [281 Cal.Rptr. 528, 810 P.2d 549] (*Anderson*).)  Defective design may be established under two theories:  (1) the consumer expectations test, which asks whether the product performed as safely as an ordinary consumer would expect when used in an intended and reasonably foreseeable manner; or (2) the risk/benefit test, which asks whether the benefits of the

9

challenged design outweigh the risk of danger inherent in the design. (*Id.* at p. 995; *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 432.) Both theories may be presented by a plaintiff to the jury. (*McCabe v. American Honda Motor Co.* (2002) 100 Cal.App.4th 1111, 1126 [123 Cal.Rptr.2d 303] (*McCabe*).)" (*Saller, supra,* 187 Cal.App.4th at pp. 1231-1232.)

Under the consumer expectations test, "a plaintiff is required to produce evidence of the 'objective conditions of the product' as to which the jury is to employ its 'own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence.' [Citation.]" (*Sparks v. Owens-Illinois, Inc.* (1995) 32 Cal.App.4th 461, 472.) "The consumer expectations test is reserved for cases in which the everyday experience of the products' users permits a conclusion that the product's design violated minimum safety assumptions, and is 'defective *regardless of expert opinion about the merits of the design*.' ([*Soule, supra,* 8 Cal.4th] at p. 567.) Therefore, if the minimum safety of a product is within the common knowledge of lay jurors, expert witnesses may not be used to demonstrate what an ordinary consumer should expect. Nonetheless, the inherent complexity of the product itself is not controlling on the issue of whether the consumer expectations test applies; a complex product 'may perform so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers.' (*Id.* at p. 569.)" (*Saller, supra,* 187 Cal.App.4th at p. 1232; see *Morson v. Superior Court* (2001) 90 Cal.App.4th 775; Davis et al. 2A American Law of Products Liability 3d (rev'd ed. 2007) § 28:37, part 8, p. 58 (American Law of Products Liability 3d).)

Moreover, "[t]he fact that expert testimony was required to establish legal causation for plaintiffs' injuries does not mean that an ordinary user of the product would be unable to form assumptions about the safety of the products. . . . In *Soule*, the court expressly rejected the contention that the consumer expectations test is improper whenever '["crashworthiness," a complex product, or] technical questions of causation are at issue,' stating that 'ordinary consumer expectations are not irrelevant simply because expert testimony is required to prove . . . that a condition of the product as

10

marketed was a "substantial," and therefore "legal," cause of injury.' ([*Soule, supra,* 8 Cal.4th] at pp. 568-569 & fn. 6.)" (*Jones v. John Crane, Inc.* (2005) 132 Cal.App.4th 990, 1003.)

A trial court should not instruct a jury on the consumer expectations test "'when the ultimate issue of design defect calls for a careful assessment of feasibility, practicality, risk, and benefit,' since 'in many instances it is simply impossible to eliminate the balancing or weighing of competing considerations in determining whether a product is defectively designed or not.' [Citation.]" (*Saller, supra,* 187 Cal.App.4th at p. 1233.) "[A] complex product, even when it is being used as intended, may often cause injury in a way that does not engage its ordinary consumers' reasonable minimum assumptions about safe performance. For example, the ordinary consumer of an automobile simply has 'no idea' how it should perform in all foreseeable situations, or how safe it should be made against all foreseeable hazards." (*Soule, supra,* 8 Cal.4th at pp. 566-567.) "In those cases, where the plaintiff's theory of defect seeks to examine the behavior of 'obscure components under complex circumstances' outside the ordinary experience of the consumer, the consumer expectation test is inapplicable; and defect may only be proved by resort to the risk-benefit analysis." (*McCabe, supra,* 100 Cal.App.4th at p. 1122.)

In *Soule, supra,* 8 Cal.4th 548, the plaintiff's ankles were injured in a car accident. (*Id.* at p. 556.) She sued her vehicle's manufacturer claiming that defects in her vehicle permitted its left wheel to break free in the accident, collapse rearward, and smash the floorboard into her feet. (*Ibid.*) The manufacturer denied that the vehicle was defective and claimed that the collision's force alone caused the plaintiff's injuries. (*Ibid.*) The Supreme Court held that the jury should not have been instructed on ordinary consumer expectations. (*Id.* at p. 570.) The court explained, "Plaintiff's theory of design defect was one of technical and mechanical detail. It sought to examine the precise behavior of several obscure components of her car under the complex circumstances of a particular accident. The collision's exact speed, angle, and point of impact were disputed. It seems settled, however, that plaintiff's Camaro received a substantial oblique blow near the left

11

front wheel, and that the adjacent frame members and bracket assembly absorbed considerable inertial force. [¶] An ordinary consumer of automobiles cannot reasonably expect that a car's frame, suspension, or interior will be designed to remain intact in any and all accidents. Nor would ordinary experience and understanding inform such a consumer how safely an automobile's design should perform under the esoteric circumstances of the collision at issue here. Indeed, both parties assumed that quite complicated design considerations were at issue, and that expert testimony was necessary to illuminate these matters. Therefore, injection of ordinary consumer expectations into the design defect equation was improper." (*Ibid.*) Often the consumer expectations test is not applicable to cases concerning claims of defects in the design of an automobile because complex technical matters are involved. But there are examples of what may reasonably be expected from motor vehicles, including, for example, from airbags. (2A American Law of Products Liability 3d, *supra,* at § 28:46, part 8, pp. 70-72; *Bresnahan v. Chrysler Corp.* (1995) 32 Cal.App.4th 1559.)

Consumers have expectations about whether a vehicle's driver seat will collapse rearward in a rear-end collision. (*Mikolajczyk v. Ford Motor Co.* (Ill. 2008) 901 N.E.2d 329, 352 (*Mikolajczyk*).) In *Mikolajczyk*, a car traveling about 60 miles per hour struck the rear end of a Ford Escort that was stopped at a red light.[5] (*Id.* at p. 333.) The driver's seat in the Ford Escort collapsed rearward and the driver suffered severe, irreversible brain trauma and died from his injuries. (*Id.* at pp. 321, 353, 357.) His widow brought an action against Ford Motor Company, the Escort's manufacturer, and Mazda Motor Corporation, the driver seat's designer, alleging strict products liability premised on the defective design of the Escort's driver's seat. (*Id.* at pp. 332-333.) The plaintiff claimed that as a result of the defective seat design, the seat collapsed when the car was struck from behind, causing her husband to be propelled rearward and to strike his head on the back seat of the car. (*Ibid*.) Following a verdict in the plaintiff's favor, the defendants

---

**5** At 60 miles per hour, the car in *Mikolajczyk, supra,* 901 N.E.2d at page 333, was traveling significantly faster than the 42 to 43 miles per hour that the Altima was traveling in this case when it hit plaintiff's Frontier.

12

appealed, claiming that the trial court erred by instructing the jury on the consumer expectations test and rejecting their tendered instruction on the risk utility test for defective design. (*Ibid*.) The Illinois Supreme Court held, in part, that the jury was properly instructed on the consumer expectations test. (*Id.* at pp. 352-353.) It stated, "In the present case, the occupant of the car seat was killed when the car was struck from behind. Rear-end collisions are reasonably foreseeable and the ordinary consumer would likely expect that a seat would not collapse rearward in such an accident, allowing the occupant to sustain massive head injury." (*Id* at p. 353.)

Defendants contend that in this case, the "collisions involved far too many complex factors, such as the force from the mass striking the Frontier, the weight of the occupants, and the interplay of multiple components in the vehicle and restraint system, to allow a consumer to arrive at any objective, common-knowledge based expectation about how plaintiff's vehicle seatback should have performed." They argue that "[t]he interplay of the Frontier's numerous component parts in a high-speed, chain-reaction crash are not within the realm of the average consumer's experience or expectation."

The accident that caused plaintiff's injuries was not as complex as defendants claim. Although there were multiple vehicles and multiple collisions in the incident, there was a single collision that caused plaintiff's injuries—plaintiff was injured when the Altima rear-ended her Frontier. That another car first hit the Altima and that plaintiff's Frontier hit the car in front of plaintiff, which in turn hit the car in front of it, after the Altima struck plaintiff's Frontier had no bearing on plaintiff's injuries. Defendants' own expert testified that plaintiff sustained her injuries during the rear-end impact on her car. Rear-end collisions are common and within the average consumer's ordinary experience. Consumers have expectations about whether a vehicle's driver seat will collapse rearward in a rear-end collision, regardless of the speed of the collision. (*Mikolajczyk, supra,* 901 N.E.2d at p. 353.)

Defendants also contend that "the physical forces at play throughout the collisions also are not within the average consumer's knowledge. Plaintiff's extensive expert testimony about complicated physics and engineering principles demonstrates that the

13

consumer expectations test was not appropriate to evaluate whether defendants' seat contained a design defect." That causation for a plaintiff's injuries was proved through expert testimony does not mean that an ordinary consumer would be unable to form assumptions about the product's safety. (*Jones v. John Crane, Inc., supra,* 132 Cal.App.4th at p. 1003; *Soule, supra,* 8 Cal.4th at pp. 568-579 & fn. 6 [rejecting the contention that the consumer expectations test is improper if crashworthiness, a complex product, or technical questions of causation are at issue].) Accordingly, the trial court properly instructed the jury on the consumer expectations test. (*Soule, supra,* 8 Cal.4th at p. 567; *Saller, supra,* 187 Cal.App.4th at pp. 1231-1232.)

### C. Exclusion of Defendants' Expert Testimony

Defendants state that they made offers of proof on the risks and benefits of the Frontier's seat design, that Nissan provided the strength specifications for the seat, and that Nissan tested plaintiff's seat and the seat met all of Nissan's safety specifications. Defendants argue that the trial court eliminated their defense by excluding such evidence "based on the erroneous legal assumption that plaintiff could pursue the consumer expectations test to the exclusion of the risk benefit test."

In *Soule, supra,* 8 Cal.4th 548, the court held that in those cases in which the consumer expectations test is appropriate, "[t]he manufacturer may not defend a claim that a product's design failed to perform as safely as its ordinary consumers would expect by presenting expert evidence of the design's relative risks and benefits." (*Id.* at p. 566; *Bresnahan v. Chrysler Corp., supra,* 32 Cal.App.4th at pp. 1569-1570 ["we agree with plaintiff that Chrysler may not adduce risk-benefit analysis as a counterweight or 'defense' to proof under the consumer expectations test"].) Because, as we held above, the trial court properly permitted plaintiff to proceed on the consumer expectations test, it did not err in excluding defendants' risk-benefit evidence. (*Soule, supra,* 8 Cal.4th at p. 566; *Bresnahan v. Chrysler Corp., supra,* 32 Cal.App.4th at pp. 1569-1570.)

14

D.     *Substantial Evidence Supported the Jury's Finding Under the Consumer Expectations Test*

Defendants contend that "plaintiff was involved in a severe, multi-vehicle, multi-impact, chain-reaction crash" and argue that the trial court erred in instructing the jury on the consumer expectations test because plaintiff failed to present substantial evidence from which the jury could find how an ordinary consumer would expect plaintiff's seatback to respond in such an accident. Plaintiff's presentation was deficient, defendants argue, because she did not present advertising or marketing literature, vehicle manuals, or consumer test reports to demonstrate an ordinary consumer's expectations.

When proceeding under the consumer expectations test, "'it is generally sufficient if the plaintiff provides evidence concerning (1) his or her use of the product; (2) the circumstances surrounding the injury; and (3) the objective features of the product which are relevant to an evaluation of its safety.' [Citation.]" (*Saller, supra,* 187 Cal.App.4th at p. 1232.) The fact finder uses "'"[its] own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence."'" [Citations.]" (*McCabe, supra,* 100 Cal.App.4th at p. 1120; *Sparks v. Owens-Illinois, Inc., supra,* 32 Cal.App.4th at p. 472 [same].) "In particular circumstances, a product's design may perform so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers. In such cases, a lay jury is competent to make that determination." (*Soule, supra,* 8 Cal.4th at p. 569.) The defectiveness of the product under this standard may be demonstrated by circumstantial evidence. (*Barker v. Lull Engineering Co., supra,* 20 Cal.3d at p. 430.)

In this case, plaintiff provided evidence concerning her use of the product, the circumstances of the accident, and the objective features of her car seat that were relevant to an evaluation of its safety. (*Saller, supra,* 187 Cal.App.4th at p. 1232.) Plaintiff was not required to produce evidence in the form of advertising or marketing literature, vehicle manuals, or consumer test reports to demonstrate an ordinary consumer's expectations of how the seat in plaintiff's Frontier would perform if the vehicle was struck from behind. Plaintiff presented sufficient evidence to support the jury's verdict.

15

## II.     Defendants' Liability as Component Parts Suppliers

Defendants argue that the trial court erred in refusing to instruct the jury on the component parts supplier defense, denying their motion for judgment notwithstanding the verdict based on that defense, and in excluding evidence that Nissan conceded that it provided the design specifications for the Frontier and its seat.  Those errors derived, defendants contend, from the trial court's erroneous legal conclusion that the component parts supplier defense did not apply in this case because the vehicle manufacturer and the vehicle seat manufacturer were equally liable for the whole vehicle.  Because the Frontier's driver's seat was not a component part within the meaning of the component parts doctrine, the trial court did not err.

"The component parts doctrine provides that the manufacturer [or supplier] of a component part is not liable for injuries caused by the finished product into which the component has been incorporated unless the component itself was defective and caused harm.  [Citations.]" (*O'Neil v. Crane Co.* (2012) 53 Cal.4th 335, 355; *Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129 Cal.App.4th 577, 581-582 (*Tellez-Cordova*).)  "The doctrine applies to '"generic" or "off-the-shelf" components, as opposed to those which are "really a separate product with a specific purpose and use." [Citation.]'  [Citation.]" (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 582; *Springmeyer v. Ford Motor Co.* (1998) 60 Cal.App.4th 1541, 1554 (*Springmeyer*); *Gonzalez v. Autoliv ASP, Inc.* (2007) 154 Cal.App.4th 780, 788 (*Gonzalez*); but see *Taylor v. Elliott Turbomachinery Co., Inc.* (2009) 171 Cal.App.4th 564, 584 [rejecting the argument that the component parts doctrine "applies only 'to manufacturers of fungible, multi-use components that can be used for myriad purposes'"].)[6]

---

[6]     The California Supreme Court has not determined whether the component parts defense is limited to fungible products.  (*Crane v. O'Neil, supra,* 53 Cal.4th at p. 355, fn. 10; see 7A American Law of Products Liability, *supra,* at § 97:5, part 22, p. 16 ["Where a component is designed to be used in a particular type of vehicle, it has, in that sense, only one purpose and use.  On the other hand, where it is installed in a number of different models, in that sense it has multiple uses.  Whether a product is a 'generic' or 'off-the-shelf' component is, thus, a matter for argument under the circumstances"].)

"The policy reasons behind the component parts doctrine are well established: '"[M]ulti-use component and raw material suppliers should not have to assure the safety of their materials as used in other companies' finished products. First . . . that would require suppliers "to retain experts in a huge variety of areas in order to determine the possible risks associated with each potential use."' [Citation.] A second, related rationale is that "finished product manufacturers know exactly what they intend to do with a component or raw material and therefore are in a better position to guarantee that the component or raw material is suitable for their particular applications." [Citations.]' [Citation.]" (*Tellez-Cordova, supra,* 129 Cal.App.4th at pp. 581-582.)

The seat in plaintiff's Frontier was not a component part because it was not a generic, fungible, multi-use, or off-the-shelf component. (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 582; *Springmeyer, supra,* 60 Cal.App.4th at p. 1554; *Gonzalez, supra,* 154 Cal.App.4th at p. 788.) Instead, it was a separate product with a specific purpose and use. (*Tellez-Cordova, supra,* 129 Cal.App.4th at p. 582; *Springmeyer, supra,* 60 Cal.App.4th at p. 1554; *Gonzalez, supra,* 154 Cal.App.4th at p. 788.) That is, the seat was designed and manufactured to be used in the Frontier. Accordingly, because the Frontier seat was not a component part within the meaning of the component parts doctrine, the trial court did not err in its rulings concerning the nonapplicability of that doctrine.

### III.    Ikeda's Liability as an Engineering Services Provider

Defendants contend that Ikeda may not be held strictly liable for a product it designed or engineered but did not manufacture, sell, or otherwise place in the stream of commerce. We agree.

At trial, the parties stipulated that "Ikeda participated in the design of the seat in the subject vehicle." On appeal, the parties agree that by participating in the design of the Frontier's seat, Ikeda provided engineering services. Plaintiff contends that engineers may be held strictly liable for products for which they provide engineering and testing services, relying on cases that generally hold that any party that participates in bringing a

17

product to market may be held strictly liable for the product's defect. (*Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241; *Kasel v. Remington Arms Co.* (1972) 24 Cal.App.3d 711; *Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762; *Arriaga v. CitiCapital Commercial Corp.* (2008) 167 Cal.App.4th 1527.)

Engineers who do not participate in bringing a product to market and simply design a product are not subject to strict products liability. (*Swett v. Gribaldo, Jones & Associates* (1974) 40 Cal.App.3d 573, 576.) "[I]t is settled that 'those who sell their services for the guidance of others in their economic, financial, and personal affairs are not liable in the absence of negligence or intentional misconduct.' (*Gagne v. Bertran* (1954) 43 Cal.2d 481, 487 [275 P.2d 15].)" (*Del Mar Beach Club Owners Assn. v. Imperial Contracting Co.* (1981) 123 Cal.App.3d 898, 914 [no strict liability for soils or structural engineers]; *Swett v. Gribaldo, Jones & Associates, supra,* 40 Cal.App.3d at pp. 575-576 [no strict liability for a soils engineer]; *Stuart v. Crestview Mut. Water Co.* (1973) 34 Cal.App.3d 802, 811 [no strict liability for engineering services provided in connection with a water distribution system]; Sido, Architect and Engineering Liability (2014) § 20.04, pp. 20-26 ["The courts are presently unanimous in holding that the design professional who merely provides a service is immune from strict liability"].) In *Stuart v. Crestview Mut. Water Co., supra,* 34 Cal.App.3d at page 811, the court stated, "We cannot . . . find any basis for holding the engineers on a strict liability theory. They rendered a professional service and are in no sense analogous to manufacturers who place products on the market and who are, therefore, in the best position to spread the cost of injuries resulting from defective products. [Citations.]." Because Ikeda provided engineering services in connection with the Frontier seat, it could only be held liable for defects in the seat on theories of negligence or intentional misconduct and not on a strict products liability theory. (*Del Mar Beach Club Owners Assn. v. Imperial Contracting Co.,* 123 Cal.App.3d at p. 914; *Swett v. Gribaldo, Jones & Associates, supra,* 40 Cal.App.3d at pp. 575-576; *Stuart v. Crestview Mut. Water Co., supra,* 34 Cal.App.3d at p. 811; *Ontiveros v. 24 Hour Fitness USA, Inc.* (2008) 169 Cal.App.4th 424, 434; see 6

18

Witkin, *supra,* at Torts § 1520, p. 978 ["strict liability is not imposed for providing services"].)

Plaintiff attempts to distinguish the engineering exception authorities cited above on the ground that they "crossed over into mass-produced homes issues, thus the analysis of 'designer' and 'engineering' services were specific to that real property setting. No real property issue was involved here." Plaintiff's attempt to distinguish those cases is unavailing. Although some of the cases arose in a "real property setting," the courts' analysis in those cases did not depend on real property issues.

## IV.    Apportionment of Fault Among Other Manufacturers

Defendants contend that the trial court erred in excluding evidence, that would have allowed the jury to apportion fault among Nissan and the component part manufacturers—Autoliv and Faurecia.[7] Defendants argue that they could not be held liable for completed products or component parts that others manufactured. We agree.

### A.    *Background*

At a pretrial hearing, defense counsel argued that defendants had the "burden of apportioning fault with respect to any fault in this accident, and that fault can be apportioned between individuals or companies that are negligent as well as strictly liable. [¶] That could be the car manufacturer. That could be the other driver. That could be the manufacturer of the seatbelt."

The trial court asked for an offer of proof. Defense counsel first provided background for defendants' position. Defense counsel said that Nissan determined the specifications for the seat and defendants designed the seat according to those specifications. Nissan chose the recliner mechanism manufacturer and required defendants to use that manufacturer and that part in the seat. The driver of the other

---

**7**     We do not decide whether fault may be apportioned to Autoliv and Faurecia because it might be found that the component parts supplier defense has some applicability.

19

vehicle, Nissan, the manufacturer of the seat belt, and the manufacturer of the recliner had settled with plaintiff. Defense counsel argued that the driver and all of those entities were potentially liable for some portion of the fault in this case and defendants had the right to present evidence of their fault.

The trial court asked defense counsel to list the names of the witnesses defendants would present in support of their claim and to provide an outline of their testimony. Plaintiff's counsel interjected, "Yes, all of the witnesses that they want to present on these issues are on the witness list. The documents are on the exhibit list. [¶] There's no dispute as to that." Nevertheless, plaintiff's counsel argued, defense counsel's position that defendants were entitled to present evidence in support of an apportionment argument was incorrect as a matter of law. Plaintiff's counsel argued that while there could be apportionment between defendants and the negligent driver that started the chain reaction accident, there could be no apportionment among the other "defendants" because they were all strictly liable—i.e., jointly and severally liable—for the defective product, whether the product was defined as the car, the seat, or the recliner. Plaintiff's counsel argued that Nissan, Faurecia, and Autoliv had entered good faith settlements and "they [presumably defendants] get a credit." The trial court reserved its ruling.

Later, the trial court stated that it would give its "tentative thoughts" on the apportionment of liability issue. The trial court stated, "I see apportionment as only between the product involved. In other words, all of those in the chain of distribution from Nissan on as being vicarious liability, joint and several liability, as pointed out by plaintiff. [¶] There will be no comparative liability as to anybody in that chain, other than the product that we're now dealing with. [¶] The only other comparative can be the fault of Clark or any others. That will—so but we're not going to compare the liability of any of the other persons involved in the chain, okay?" Defense counsel stated, "Your Honor, I have a brief on that that we wrote. [¶] We would ask the court—" The trial court interjected, "—All right. [¶] That's my ruling." The trial court gave defense counsel permission to file the brief.

20

When, on the next day, defense counsel requested permission from the trial court to discuss in opening argument that the seat belt was defective and that plaintiff would have not been injured if her Frontier had another seat belt, plaintiff's counsel said, "We ruled on this yesterday." The trial court agreed. Defense counsel stated that there had only been preliminary rulings on the motions in limine. The trial court said, "But who—this is all part of the Nissan products." Defense counsel disagreed, arguing that the seat belt was not defendants' product and they were not responsible for another party's product. The trial court responded, "Look at [*sic*], I'm not going to even go there. [¶] As far as I'm concerned, we're only going to talk about the seat. We're not going to talk about the seatbelt or anything else. [¶] We're not going to argue, you know, another product within the vehicle is the proximate causation of accident. [¶] The only comparative liability that we're going to have is the drivers of the other cars. [¶] That's it." When defense counsel informed the trial court that he intended to continue to address the issue "throughout the entire case," the trial court stated, "I just want you to know. [¶] That is my ruling, okay?" Defense counsel asked the trial court to keep an open mind as the evidence was presented. The trial court said, "All right."

### B.    *Application of Relevant Principles*

Under the doctrine of strict products liability, all defendants in the chain of distribution are jointly and severally liable, meaning that each defendant can be held liable to the plaintiff for all damages the defective product caused. (*Bostick v. Flex Equipment Co., Inc.* (2007) 147 Cal.App.4th 80, 89-90 (*Bostick*).) Courts have permitted comparative fault in certain situations in strict products liability cases. Thus, in *Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 736-737, the Supreme Court held that the plaintiff's recovery in an action for strict products liability may be reduced in proportion to the plaintiff's comparative fault, and in *Safeway Stores, Inc. v. Nest-Kart* (1978) 21 Cal.3d 322, 330, it held that liability may be apportioned between a defendant whose liability was based on strict products liability and another defendant whose liability was based on negligence.

21

In 1986, the voters adopted Proposition 51 (the Fair Responsibility Act of 1986), an initiative measure that amended Civil Code section 1431 and added Civil Code sections 1431.1 through 1431.5. (*Bostick, supra,* 147 Cal.App.4th at p. 84, fn. 1.) Proposition 51 made liability for noneconomic damages several only instead of joint and several. (Civ. Code, § 1431.2[8]; *Bostick, supra,* 147 Cal.App.4th at p. 84.) Proposition 51 was adopted to address the "deep pocket" effect of joint and several liability in which defendants who were perceived to have substantial financial resources or insurance were added to lawsuits even though there was little or no basis for finding them at fault because they could be held financially liable for all damages if they were found to share even a fraction of fault. (Civ. Code, § 1431.1.) Nevertheless, in actions subject to Proposition 51, all defendants remain jointly and severally liable for economic damages. (*DaFonte v. Up–Right, Inc.* (1992) 2 Cal.4th 593, 600.)

In a non-strict products liability case to which Proposition 51 applies, it is error for a trial court not to allow the jury to assess the comparative fault of defendants who settled before trial. (*Roslan v. Permea, Inc.* (1993) 17 Cal.App.4th 110, 112-113.) Likewise, it is error to exclude evidence of the culpability of defendants who settled before trial to allow the jury to make that assessment. (*Ibid.*)

Since its enactment, a split in authority of sorts has developed over Proposition 51's application to strict products liability actions. (*Garcia v. Duro Dyne Corp.* (2007) 156 Cal.App.4th 92, 103 & fn. 5.) In *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 633 (*Wimberly*) and *Bostick, supra,* 147 Cal.App.4th at pages 92-93, the courts held that Proposition 51 does not apply in a strict products liability action when a single defective product produced a single injury to the plaintiff. That is, all defendants

---

[8]    Civil Code section 1431.2, subdivision (a) provides:
"In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."

22

in the stream of commerce of that single product remain jointly and severally liable.  In *Arena v. Owens-Corning Fiberglas Corp*. (1998) 63 Cal.App.4th 1178, 1198 (*Arena*) and *Wilson v. John Crane, Inc.* (2000) 81 Cal.App.4th 847, 852, 859 (*Wilson*), the courts held, in strict products liability asbestos exposure actions, that Proposition 51 applies when there are multiple products that caused the plaintiff's injuries and there is evidence that provides a basis to allocate fault for noneconomic damages between the defective products.

This action is not specifically covered by either the *Wimberly/Bostick* line of cases or the *Arena/Wilson* line of cases.  It does not fit precisely within the *Wimberly/Bostick* line of cases because, although plaintiff's injuries may be viewed as indivisible, and thus as a single injury, those injuries may not have been caused by a single defective product. There was evidence from which the jury could have concluded that plaintiff's injuries were caused by a defective recliner mechanism.  There was evidence that plaintiff's injuries were caused by a design defect in plaintiff's seat belt that allowed plaintiff to "ramp" up her vehicle's seat—i.e., the reason that plaintiff "ramped" up her vehicle's seat was because her seat belt was designed in such a manner that it slackened when the seatback collapsed.  Also, the trial court's ruling precluding evidence on apportionment of fault prevented defendants from introducing evidence that Nissan was at fault for plaintiff's injuries.  Nor does this action fit precisely within the *Arena/Wilson* line of cases because, although there was evidence plaintiff may have suffered her injuries as a result of multiple defective products, there was no evidence that her injuries were divisible for purposes of allocating fault for her noneconomic damages.  We believe, however, that the analysis in support of the *Arena/Wilson* line of cases is persuasive.[9]

In *Wilson, supra,* 81 Cal.App.4th at page 858, the court stated, "The perceived evil to be eliminated by Proposition 51 was the imposition of liability for noneconomic damages far out of proportion to the defendant's share of responsibility for those damages.  We see no reason to believe that the voters thought that evil was any less or

---

[9]     See Restatement (Third) of Torts (2000) Apportionment of Liability, section 1, Comment b [apportioned for all torts claims].

different when the defendant was a manufacturer held strictly liable for a defective product, particularly when the statute would unquestionably apply to a manufacturer held liable for negligence. The voters chose to use a legal term of art ('comparative fault') which, as we have seen, embraces all such claims." Accordingly the court held that Civil Code section 1431.2 applies to strict products liability actions. (*Id.* at p. 859.)

Here, the trial court ruled that defendants could not present evidence in support of its theory that liability should be apportioned among Nissan and the other parts manufacturers. Moreover, even though some evidence was admitted from which the jury could have concluded that others were at fault for plaintiff's injuries, the court's special verdict form, consistent with its ruling on apportionment of fault, only provided for apportionment between Gallie and defendants. That was error. Accordingly, we remand the matter for retrial solely on the issue of apportionment of fault. In that apportionment, Ikeda may be found at fault for plaintiff's injuries and assigned a proportionate share of plaintiff's noneconomic damages, but not on a strict products liability theory. The liability of the defendants has been found by the jury. That liability shall not be retried—only the allocation of damages.

## V. Medical Bills

Defendants contend that the jury's verdict was improperly inflated because the trial court erroneously admitted evidence of the full amount billed for plaintiff's past medical care, rather than the amount plaintiff's medical care providers accepted. Although the admission of evidence of the full amount billed for plaintiff's medical care was error, defendants have failed to show that the error was prejudicial.

### A. Background

Defendants moved in limine that evidence of the full amount that plaintiff's medical care providers billed for plaintiff's medical care be excluded and evidence of the amount that her medical providers accepted as full payment be admitted. The trial court denied the motion. Thereafter, the parties stipulated before the jury that plaintiff's

24

medical care had been reasonable and necessary and that plaintiff's medical bills for past medical care totaled $777,905. As part of its special verdict, the jury awarded plaintiff $777,905 in past medical expenses. In the judgment, pursuant to the stipulation of the parties, the trial court reduced that award to $462,608.68, the amount accepted by plaintiff's medical care providers.

### B.    Forfeiture

Plaintiff contends that defendants have forfeited appellate review of this issue by virtue of the stipulation that went to the jury that plaintiff's past medical bills totaled $777,905—i.e., the full amount billed. We disagree. Having received an adverse ruling on their motion in limine, defendants did not forfeit review by stipulating that plaintiff's past medical care was reasonable and necessary and that the bills for that medical care totaled $777,905. That is, by stipulating that the billed cost of plaintiff's past medical care was a certain sum, defendants did not forfeit their claim that the jury should not have heard that sum.

### C.    Application of Relevant Principles

In *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 555 (*Howell*)) the Supreme Court held, in an opinion rendered on the same day the jury rendered its verdict in this case, that "a plaintiff may recover as economic damages *no more* than the reasonable value of the medical services received and is not entitled to recover the reasonable value if his or her actual loss was less. [Citation.]" It stated that if a medical care "provider has, by prior agreement, accepted less than a billed amount as full payment, evidence of the full billed amount is not itself relevant on the issue of past medical expenses." (*Id.* at p. 567.) The Supreme Court did not express an opinion about whether evidence of the full amount billed was relevant or admissible on "other issues, such as noneconomic damages or future medical expenses." (*Ibid.*)

The court in *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308 (*Corenbaum*) addressed the issues left open by the court in *Howell, supra,* 52 Cal.4th at page 567. The

25

court held that evidence of the full amount billed for a plaintiff's medical care is not relevant to damages for future medical care or noneconomic damages and its admission is error. (*Corenbaum, supra,* 215 Cal.App.4th at pp. 1319, 1330-1333.) The court held that the trial court's erroneous admission of such evidence was prejudicial in that case because the record "clearly demonstrate[d]" that the damages awards were based on the full amount billed and not on the lesser amount the plaintiff's medical providers had accepted as full payment. (*Id.* at p. 1333.) The court reversed the award of compensatory damages and remanded for a new trial limited to the issue of compensatory damages. (*Id.* at pp. 1333-1334.)

Although the trial court erred in this case by admitting evidence of the full amount billed for plaintiff's medical care, defendants have failed to show that the error was prejudicial. Defendants do not cite any evidence before the jury or any argument of plaintiff's counsel that plaintiff's claims for noneconomic damages or future medical expenses were based on or influenced by the stipulation that plaintiff's medical bills for past medical care totaled $777,905. As for those past full amount medical care bills, the jury's award of $777,905 was reduced post-verdict on stipulation of the parties to $462,608.68, the amount that plaintiff's medical care providers accepted. Accordingly, the jury's finding that plaintiff suffered damages of $24,744,764 is affirmed.

## DISPOSITION

The judgment is reversed and the matter is remanded for a retrial. The jury's findings that defendants, except Ikeda, are liable and that plaintiff suffered damages of $24,744,764 are affirmed. The retrial is limited to the issue of apportionment of fault. In that apportionment, Ikeda may be found at fault for plaintiff's harm, but not on a strict products liability theory. The parties shall bear her and their own costs on appeal.

**CERTIFIED FOR PUBLICATION**


                                                MOSK, Acting P. J.


We concur:


        KRIEGLER, J.


        MINK, J.*

---

\*      Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.