Filed 4/9/20

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MARTHE SCHREIBER, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> STEPEHEN K. LEE et al., <br><br>     Defendants and Appellants. | A149969 <br><br> (San Francisco City & County Super. Ct. No. CGC 13534301) |
| MARTHE SCHREIBER, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> GOLDEN PROSPERITIES MANAGEMENT COMPANY, LLC, <br><br>     Defendant and Appellant. | A150093 <br><br> (San Francisco City & County Super. Ct. No. CGC 13534301) |

## I. INTRODUCTION

Plaintiff Marthe Schreiber was seriously injured when she fell through a skylight built into the deck of her apartment. Defendant Stephen K. Lee built the three-unit apartment building and previously owned the property. At the time of the accident, Lee's adult children owned the property, and it was managed by defendant Golden Prosperities Property Management Company LLC (Golden Prosperities). Prior to trial, Schreiber settled with the Lee children for $2.5 million.

---

    * Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IIIA.–F.

1

At the close of Schreiber's case, Lee moved for nonsuit on the ground her claims against him were based on a patent construction defect and therefore barred by the statute of repose set forth in Code of Civil Procedure section 337.1.  The trial court denied the motion, and the jury thereafter awarded Schreiber damages totaling just over $2.6 million.  The jury also apportioned fault, allocating 12 percent to Schreiber, 54 percent to Lee, 16 percent to Golden Prosperities, and 18 percent collectively to the Lee children (allocations Schreiber does not challenge on appeal).

After reducing the verdict to reflect Schreiber's percentage of fault, the trial court offset the entirety of the economic damages by the amount of the settlement attributable to such damages.  However, it denied any credit to Lee and Golden Prosperities as to the noneconomic damages and entered judgment against Lee for $756,000 and against Golden Prosperities for $224,000.

Lee and Golden Prosperities make numerous claims of error during trial, and also claim they are entitled to a full settlement credit as to noneconomic damages.  We affirm in all respects except as to the settlement credit, concluding Golden Prosperities, but not Lee, is entitled to a credit against both economic and noneconomic damages.  We publish our discussion of the settlement credit issue given the somewhat unusual circumstances, namely that the Lee children were not only found independently negligent but also bore imputed liability for Golden Prosperities' negligence.

## II. BACKGROUND[1]

Schreiber has resided in the apartment building at issue since it was built in 1980.  Lee, who then owned the property, did the development work.

---

[1] We only briefly summarize the facts here, discussing them in more detail in connection with the issues defendants raise on appeal.

The building has a garage on the ground floor and three residential units on the upper floors. Schreiber's apartment has a deck atop the roof of the garage, with an imbedded skylight that lets light into the garage.

In the late 1980's, Lee and his wife transferred ownership of the property to their six children. Although Schreiber sought to have the deed declared invalid, the trial court found the Lee children were, indeed, the lawful owners of the property.

In 2005, Golden Prosperities was formed and took over management of the property. It was a "member-owned management company," with Lee and the Lee children serving as board members. Lee was also chairman of the board and chief executive officer. Sons Gordon Lee and Peter Lee handled day-to-day operations, and were the only ones paid.

At some point, Schreiber hired a contractor to install planter boxes around the skylight because she was concerned it might pose a danger to visiting children playing on the deck. She never thought the skylight was strong enough to stand on, and never put anything on it.

In 2013, Schreiber and an employee of hers were gardening on the deck. As she was handing him a "six-pack of flowers from one end of the skylight to the other," she fell through the skylight.

Schreiber was hospitalized at San Francisco General Hospital for about two weeks, and at Laguna Honda for approximately five weeks. She had no insurance at the time, and was billed $230,843.06 by San Francisco General and $56,841 by Laguna Honda. Schreiber later became retroactively eligible for Medi-Cal, and under Medi-Cal's contract with San Francisco General and Laguna Honda, the medical bills were resolved for far lesser amounts, $43,243.64 for San Francisco General and $14,283.45 for Laguna Honda.

Schreiber subsequently filed the instant action, eventually naming as defendants Lee, Golden Prosperities, the Lee children, and Stephen K. Lee Enterprises, a partnership formed around 1988 that previously managed the property.[2] Prior to trial, she settled with the Lee children and Stephen K. Lee Enterprises for $2.5 million.

Following the close of Schreiber's case-in-chief, Lee moved for nonsuit, asserting her claims against him were based on a patent construction defect and therefore barred by the four-year statute of repose. The court denied the motion.

The jury eventually awarded Schreiber just over $2.63 million in damages: $1.23 million in economic damages and $1.4 million in noneconomic damages.[3] It allocated 12 percent of the fault to Schreiber, 54 percent to Lee, 16 percent to Golden Prosperities, and 18 percent collectively to the Lee children (3 percent each).

Prior to entry of judgment, Lee and Golden Prosperities moved for an offset for the full amount of the settlement. Following further briefing on whether the Lee children, as the owners of the property, had a nondelegable duty with respect to its condition, the court denied the motion. Thereafter, the court offset the economic damages in full and entered judgment against Lee for $756,000 (his proportional share of the noneconomic damages) and against Golden Prosperities for $224,000 (its proportional share). The court

---

[2] Lee, himself, had no ownership interest in, nor was he otherwise involved with, this partnership.

[3] We have rounded the amounts for ease of reference.

4

also denied motions for a new trial, to set aside the verdict, and for judgment notwithstanding the verdict.[4]

## III.   DISCUSSION

### A. Denial of Nonsuit Based on Statute of Repose

Lee continues to maintain that Schreiber's claims against him are barred by the four-year statute of repose set forth in Code of Civil Procedure section 337.1.[5]

Our standard of review of a nonsuit ruling is well-established:  "Rulings on motions for nonsuit and for [judgment notwithstanding the verdict] are reviewed for the existence of substantial evidence.  (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1580 . . . [nonsuit]; *Stubblefield Construction Co. v. City of San Bernardino* (1995) 32 Cal.App.4th 687, 703 . . . [judgment notwithstanding the verdict].)  . . . [W]e examine the entire record for substantial evidence to support them.  Whereas the body of evidence pertinent to nonsuit is that identified in the plaintiff's opening statement or case-in-chief [citation], the entire body of evidence presented at trial is pertinent to a [judgment notwithstanding the verdict] motion."  (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 845.)

---

[4] Lee and Golden Prosperities separately appealed.  On our own motion, we consolidated the appeals for purposes of oral argument and opinion.

[5] "[A] statute of limitations creates 'a time limit for suing in a civil case, based on the date when the claim accrued.' . . . [¶]  A statute of repose, on the other hand, puts an outer limit on the right to bring a civil action. That limit is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant." (*CTS Corp. v. Waldburger* (2014) 573 U.S. 1, 7–8, superseded by statue on other grounds as stated in *In re Dowling* (6th Circ. 2015) 778 F.3d 545, 533, fn. 2.)

Code of Civil procedure section 337.1 provides in pertinent part:

"(a)  Except as otherwise provided in this section, no action shall be brought to recover damages from any person performing or furnishing the design, specifications, surveying, planning, supervision or observation of construction or construction of an improvement to real property more than four years after the substantial completion of such improvement for any of the following:

(1) Any patent deficiency in the design, specifications, surveying, planning, supervision or observation of construction or construction of an improvement to, or survey of, real property;

(2) Injury to property, real or personal, arising out of any such patent deficiency; or

(3) Injury to the person or for wrongful death arising out of any such patent deficiency. [¶]  . . . [¶]

"(d) The limitation prescribed by this section shall not be asserted by way of defense by any person in actual possession or the control, as owner, tenant or otherwise, of such an improvement at the time any deficiency in such an improvement constitutes the proximate cause of the injury or death for which it is proposed to bring an action.

"(e) As used in this section, 'patent deficiency' means a deficiency which is apparent by reasonable inspection."[6]  (Code Civ. Proc., § 337.1, subds. (a)(1)–(3), (d), (e).)

Whether a patent defect exists is determined by an objective standard: "The test to determine whether a deficiency is patent is based on the average consumer's reasonable expectations.  The test is thus objective rather than subjective; it is not applied to each individual user." (*Tomko Woll Group Architects, Inc. v. Superior Court* (1996) 46 Cal.App.4th 1326, 1339.)  " 'The

---

[6]  Thus, while Golden Prosperities "joins" in all issues Lee raises on appeal, the statute of repose defense applies only to Lee, who previously owned the property and built the apartment building.

use of an objective test for a patent defect effectuates the broad protection afforded contractors by the statute by eliminating the possibility that a defect could be deemed patent as to some plaintiffs and latent as to others depending on the circumstances of each person injured as a result of the defect.' " (*Id.* at p. 1339, fn. 6, italics omitted.) "Whether a defect is apparent by reasonable inspection is a question of fact." (*Winston Square Homeowner's Assn. v. Centex West, Inc.* (1989) 213 Cal.App.3d 282, 290.)

Lee maintains Schreiber's claims against him were based on a patent defect because she knew the skylight was dangerous. In other words, even assuming the defect in the skylight "may have [originally] been latent," according to Lee, Schreiber's "discovery of its defective and dangerous qualities, caused it to become patent." (Italics omitted.)

However, "under [Code of Civil Procedure] sections 337.1 and 337.15, even actual observation of a deficiency or its immediate effects will not make it patent if the average consumer would not have fully understood its physical cause or known it to be a deficiency. A design deficiency, for example, resulting in inadequate drainage of a deck was held arguably latent because the nonexpert owners and occupants could have reasonably thought better maintenance would prevent the periodic flooding (*Geertz v. Ausonio* [(1992)] 4 Cal.App.4th [1363,] 1371–1372.); a defect in an office building's heating and air conditioning system was likewise held latent because the precise mechanical cause of the malfunction could not be determined (*Baker v. Walker & Walker, Inc.* (1982) 133 Cal.App.3d 746, 762–763. . .)." (*Chadwick v. Fire Ins. Exchange* (1993) 17 Cal.App.4th 1112, 1123.) "[I]f a reasonable inspection would reveal only the manifestation of a defect but not its cause, i.e., the defect itself, then the defect is not necessarily patent." (*Geertz v. Ausonio,* at p. 1368, italics omitted.)

7

In urging that the skylight was a patent defect, Lee relies on Schreiber's testimony that she placed planter boxes around it because she "thought that [visiting] kids might want to play on it, and I thought that might be dangerous, and so I thought I would try to make it safer." She further testified that when she moved into the unit in 1980, she "had no idea that the skylight was dangerous at that time. . . . [A]fter nine years, when I had little children coming up on the deck, I reconsidered that. But when I moved in, I would have never imagined . . . I was moving into a defective building." "[M]y testimony's been that I thought putting the barriers would make it safer. I don't know that I thought it was ever completely safe. . . . But after I put the planter boxes, I no longer thought it was dangerous for the children to play there."

Two expert witnesses testified on behalf of Schreiber about the skylight. Gerald Fulghum, a safety engineer, testified that, "based on the Cal/OSHA rules that applied the day that [Lee] finished construction" there should have been "a skylight screen[, a] skylight capable [of] supporting 200 pounds, or the perimeter protected by a 42-inch high standard guardrail." He explained "[i]f it was a skylight constructed with sufficient strength of 200 pounds, it would look just like that. If it had the screen, a skylight screen, we would see that across the top. If it had the other type of skylight screen that goes underneath it, which we also call burglar bars, you wouldn't be able to see it. And of course if it had a guardrail, you'd be able to see the railings around the four sides." Robert Benz, a forensic architect and general contractor, testified that the skylight should have had a 42-inch high guard rail around it, as required by the building code.

The jury was specifically asked to find whether the asserted deficiencies in the skylight were patent and thus answered the following

question on the special verdict form: "Would the deficiency in the skylight which caused the injury to Ms. Schreiber be apparent to an average person during the course of a reasonable inspection?" It answered in the negative—thus finding a latent, rather than patent, defect.

There was, as we have recited, ample evidence to submit the issue to the jury. Although the existence and placement of the skylight, itself, was patent, the deficiencies in the skylight testified to by Schreiber's experts—its inability to support 200 pounds, the lack of a 42-inch barrier, and the absence of a "skylight screen"—were latent inadequacies. Accordingly, the court did not err in denying Lee's motion for nonsuit.

### B. Admission of Medical Bills

Lee and Golden Prosperities contend the trial court erred in admitting Schreiber's medical bills without redacting the amounts billed. They also maintain the court concomitantly erred in instructing the jury it could consider the "whole bills," including the amounts billed, to "understand . . . the extent of [Schreiber's] treatment."

Lee filed two motions in limine seeking to "exclude all evidence of billed amounts of [Schreiber's] past medical expenses." The first sought to exclude the billed amounts to establish Schreiber's past medical expenses, and the second sought to exclude the billed amounts to establish the value of her future medical expenses. Following the court's tentative ruling on the admission of the bills, Lee filed an additional written objection to admission of the bills "to demonstrate the severity of plaintiff's injuries," specifically objecting to their admission to establish noneconomic damages. The court denied the second motion concerning use of the billed amounts to establish Schreiber's future medical expenses.

9

Accordingly, the court subsequently admitted Schreiber's medical bills from San Francisco General and Laguna Honda. As we have recited, the bill from San Francisco General totaled $230,843.06, but was satisfied by Medi-Cal's payment of $43,243.64. The bill from Laguna Honda totaled $56,841, but was satisfied by Medi-Cal's payment of $14,283.45. In short, the billed amounts far exceeded the amounts actually paid for Schreiber's medical care.

The court also instructed the jurors, in pertinent part, that the medical bills "may not be considered by you in terms of what the actual medical expenses are. I'm admitting the whole bills . . . for you to consider the extent of the treatment. So it's just to help you understand what the extent of the treatment is. . . . [¶] The only amounts that you can consider as past economic expenses are amounts that were actually paid." No instruction, however, limited the jury's consideration of the billed amounts in determining future economic damages or noneconomic damages.

In *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541 (*Howell*), our Supreme Court held "an injured plaintiff whose medical expenses are paid through private insurance may recover as economic damages no more than the amounts paid by the plaintiff or his or her insurer for the medical services received or still owing at the time of trial." (*Id.* at p. 566.) Accordingly, "when a medical care provider has, by agreement with the plaintiff's private health insurer, accepted as full payment for the plaintiff's care an amount less than the provider's full bill, evidence of that amount is relevant to prove the plaintiff's damages for past medical expenses, and, assuming it satisfies other rules of evidence, is admissible at trial." (*Id.* at p. 567.) And "[w]here the provider has, by prior agreement, accepted less than a billed amount as full payment, evidence of the full billed amount is not itself relevant on the issue of past medical expenses." (*Ibid.*)

10

The court in *Howell* did not consider "whether evidence of the full amount billed was relevant or admissible on 'other issues, such as noneconomic damages or future medical expenses.' " (*Romine v. Johnson Controls, Inc.* (2014) 224 Cal.App.4th 990, 1014 (*Romine*).) The Court of Appeal in *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308 (*Corenbaum*), however, squarely did so.

*Corenbaum* concluded: "Because the full amount billed for past medical services provided to plaintiffs is not relevant to the value of those services . . . the full amount billed for those past medical services can provide no reasonable basis for an expert opinion on the value of future medical services." (*Corenbaum, supra,* 215 Cal.App.4th at p. 1331.) For the same reason, "evidence of the full amount billed is not admissible for the purpose of providing plaintiff's counsel an argumentative construct to assist a jury in its difficult task of determining the amount of noneconomic damages and is inadmissible for the purpose of proving noneconomic damages."[7] (*Id.* at p. 1333.) *Corenbaum* remains the definitive decision as to the evidentiary issues it decided. (See *Hill v. Novartis Pharmaceuticals Corp.* (E.D.Cal. 2013) 944 F.Supp.2d 943, 964 & fn. 1 [after *Howell* and *Corenbaum*, the full

---

[7] Noneconomic damages " 'do not consist of only emotional distress and pain and suffering. They also consist of such items as invasion of a person's bodily integrity (i.e., the fact of the injury itself), disfigurement, disability, impaired enjoyment of life, susceptibility to future harm or injury, and a shortened life expectancy.' " (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 300.) "Noneconomic damages compensate the plaintiff for 'pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage.' ([Civ. Code,] § 3333.2, subd. (a).) [Civil Code,] [s]ection 1431.2, subdivision (b)(2) similarly defines noneconomic damages as 'subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation.' " (*Rashidi v. Moser* (2014) 60 Cal.4th 718, 720, fn. 2.)

amount of medical bills is no longer admissible to prove noneconomic damages].)

Schreiber nevertheless contends, as she successfully did in the trial court, that the San Francisco General and Laguna Honda bills were properly admitted in their entirety "to determine the type and number of healthcare-related treatments . . . [she] was forced to undergo."

In canvassing the history of the issues before it, *Corenbaum* observed that "[o]pinions by the Courts of Appeal prior to *Howell* . . . held that the rule . . . limiting the amount of a plaintiff's recovery did not preclude the admission of evidence of the full amount billed for past medical care, and stated that such evidence provided the jury a more accurate indication and a more complete picture of the extent of the plaintiff's injuries." (*Corenbaum, supra,* 215 Cal.App.4th at p. 1334, citing *Olsen v. Reid* (2008) 164 Cal.App.4th 200, 204, and *Greer v. Buzgheia* (2006) 141 Cal.App.4th 1150, 1157.) *Corenbaum* went on to point out, however, that given the often great disparity between the amounts billed and the amounts actually paid for medical services, the billed amounts are simply not a reliable guidepost for determining past or future medical expenses, or noneconomic damages. (*Corenbaum,* at p. 1333.)

Schreiber's assertion that the billed amounts were relevant to assessing the nature and extent of her injuries is simply another variation of the evidentiary proposition squarely rejected in *Corenbaum*. Indeed, the sole purpose of determining the nature and extent of a plaintiff's injuries is to assist in the determination of the plaintiff's economic and noneconomic damages. As *Corenbaum* made clear, it is not the medical billings, but the *medical records*—detailing the plaintiff's injuries, treatment and prognosis—that are relevant to determining the nature and extent of a plaintiff's

injuries. Accordingly, the trial court erred in admitting the San Francisco General and Laguna Honda medical bills without, at the very least, redacting the billed amounts. (See *Romine, supra*, 224 Cal.App.4th at p. 1013 [trial court erred in admitting "full amount billed" for plaintiff's medical care].)

It is not enough, however, for defendants to show error. To obtain relief on appeal they must also show the error was prejudicial. (*Romine, supra*, 224 Cal.App.4th at p. 1014.) " 'Claims of evidentiary error under California law are reviewed for prejudice applying the "miscarriage of justice" or "reasonably probable" harmless error standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. . . . Under the *Watson* harmless error standard, it is the burden of appellants to show that it is reasonably probable that they would have received a more favorable result at trial had the error not occurred.' " (*Meeks v. Autozone, Inc.* (2018) 24 Cal.App.5th 855, 877.)

We cannot, for several reasons, conclude it is "reasonably probable" the jury's verdict would have been more favorable to the defendants had the trial court not admitted the amounts billed.

To begin with, the jury was instructed that, in determining Schreiber's past medical expenses, it could consider only the amounts actually paid for her care. And the jury appears to have done just that, awarding only the $57,527 in past medical expenses, very close to the amounts Medi-Cal actually paid for Schreiber's medical care ($43,243.64) and the cost of her dental work ($3,500), and a far cry from the $273,086 billed by San Francisco General and Laguna Honda.

As for future medical and dental expenses, Schreiber's attorney urged the jury to award over $1.27 million. More than $1 million of this suggested amount was for a daily home health aide Schreiber claimed she needed because of a disabling neurologic injury. Whether Schreiber suffered such an

injury and would require daily assistance were the most hotly disputed aspects of her claimed injuries and future medical expenses. The jury awarded Schreiber only $684,612 in future medical expenses, indicating it rejected her claim of a permanently crippling neurologic injury requiring daily medical support. It appears the jury awarded the total amounts she claimed for future medical expenses (totaling $268,608) and future dental treatment ($12,000) and an amount for limited in-home health assistance, which defendants urged was all Schreiber could possibly need.

Finally, with respect to noneconomic damages, Schreiber's attorney urged the jury to award $5 million. The jury awarded only $1.4 million.

Considering all of the above, we cannot conclude that had the amounts billed by San Francisco General and Laguna Honda not been erroneously admitted, it is reasonably probable defendants would have obtained a more favorable result.

### C. *References to NFL Player Head Injuries and Suicides*

Lee and Golden Prosperities claim the trial court also erred in allowing the trial to become peppered with references to head injuries sustained by National Football League (NFL) players.

This topic surfaced during the testimony of Dr. Jerome Barakos, Schreiber's expert in neuroradiology. Dr. Barakos testified Schreiber suffered a "diffuse axonal shearing" brain injury. He explained this type of injury cannot be seen on an MRI or CT scan, but can be observed on microscopic examination of the brain, which cannot be performed on a live patient.

During Dr. Barakos's testimony, the trial court asked, sua sponte, about head injuries suffered by NFL players: Court: "So doctor, we've seen a lot in the press about football players that have had brain injuries that have

14

developed.  Are those brain injures normally observable or not on CT? [¶] [Lee's counsel]: Your Honor—[¶] The Court:  So this is a general question. It doesn't have to do with this case at all.  It's just a general question. [¶] [Dr. Barakos]:  So to answer your question, Your Honor, you're right.  So you've probably heard in the press, the NFLs— the brain injuries, it's referred to as CTE, or chronic traumatic encephalomalacia or encephalopathy.  That is not typically identifiable on imaging.  On [CT] scans or MRIs the brains tend to look normal.  And actually there was been several suicides by several of the players—[¶] [Lee's counsel]:  Your Honor, I have to object and move to strike all of that testimony."  The court responded:  "I'll accept the motion and strike it at this time.  So it may be something that can be brought up later on.  But I think you're—defense objects, and I think they're correct.  Stricken."

Schreiber's counsel continued questioning Dr. Barakos about diffuse axonal shearing, and Dr. Barakos went on to explain that the gray matter and the white matter of the brain are different densities.  As a result, "when the brain is bouncing around with a traumatic event, you have back and forth as well as rotational forces that cause these materials to move at slightly different velocities. . . .  And that causes a shearing . . . between the gray and the white matter. . . .[¶]  So the NFL injuries or someone that has a brain injury, the biggest concerns are . . . these forces that are propagated through the brain that result in the shearing. . . .[¶]   [A]t the shearing level you get neurons that die, which is very hard to see on MR[I] or on [CT] scan."  Lee's counsel did not object to, or move to strike, this reference to NFL player injuries.

Schreiber's attorney then asked Dr. Barakos: "And have you read accounts of NFL . . . players killing themselves so that their brains can be studied?" Lee's attorney objected, and the court sustained the objection.

Next, in response to a question about how neuronal reserves in the brain can be depleted, Dr. Barakos responded, in pertinent part: "Multiple head injuries have a cumulative effect. . . . And so that's kind of the basis of the NFL chronic traumatic encephalopathy. The more injuries you have has a cumulative effect." Lee's attorney again objected, and the court again sustained the objection.

Later during Dr. Barakos's testimony, and again sua sponte, the court asked: "To determine whether someone had brain stress, have there been studies on individuals that have died where the brains have actually been examined for brain stress?" Barakos responded: "Yes. [¶] . . . [¶] What they find is . . . as you've described as the stress. We call it shearing. It's areas of axonal death due to the stretching and the death of the cells. . . . [¶] So the histologic studies as well as in the NFL players, you see the damage to. . . ." Lee's counsel again objected: "Your Honor, I'm going to object to that and have the answer stricken." This time, however, the court overruled the objection, stating, "So in this case I've sustained your objection to the NFL players several times. This time I'm going to overrule it because I'm not suggesting that . . . we have anything that's comparable here to an NFL-type injury. What I'm interested in finding out is whether he has scientifically some additional evidence in the way of actual physical studies of the brain to show that this stress that the doctor's testified today about is, in fact, true."

In response to a question on cross-examination, Dr. Barakos again referred to the brain injuries seen in NFL players: Lee's counsel: "You said there was no bruising of the brain and no bleeding in 2013 after the accident,

16

but you said there was a delayed effect?" Barakos: "Yes. So, in other words, the idea is we don't have acute bruising of the brain. But in the setting of diffuse axonal injury or these rotatory forces, you get damage to the brain that of course is not showing up acutely as a bruise or a penetrating injury; but then you have axonal loss over time. So that would be the delayed effect. [¶] Same kind of thing with the NFL players. In other words, they're losing brain tissue over time." Lee's counsel: "Objection. [¶] . . . [¶] Objecting to the answer." The court again overruled the objection, stating, "Go ahead," with Schreiber's counsel commenting: "He [defense counsel] doesn't like the answer."

Later, during the testimony of Dr. Arnold Greenberg, a neurologist called by Schreiber, the court asked, sua sponte, "what's chronic encephalopathy? Greenberg responded "Chronic encephalopathy is a progressive brain disease which develop[s] in people with recurrent brain injuries." The court then asked "It's like football players, right?" Greenberg answered: "It's just one example. The study represented at American Academy of Neurology was unique in the sense it's been done on young functioning sports men and retired sports men who died of other causes, including suicide. It's a unique study. And it's now a rapidly evolved area in neurology." Lee's attorney objected and moved to strike the response. This time, the trial court sustained the objection, stating, "I think I'll strike it. I don't think that's relevant here."

The trial court unquestionably erred in sua sponte questioning the physicians about NFL player head injuries and injecting this topic into the trial. Schreiber did not even attempt to lay a foundation that the commentary about these highly publicized injuries was relevant, let alone admissible, to prove the nature and extent of her own injuries.

17

Contrary to Schreiber's assertion, Lee did not "invite" the trial court's error in allowing the repeated references to NFL player head injuries. While she claims Lee's attorney asked questions of her expert that elicited responses about NFL players, Lee's attorney asked only, "You said there was no bruising of the brain and no bleeding in 2013 after the accident, but you said there was a delayed effect?" After answering the question, Dr. Barakos added, without any question pending, "So that would be the delayed effect. [¶] Same kind of thing with the NFL players. In other words, they're losing brain tissue over time." Lee's counsel objected, but the court overruled the objection. Schreiber also claims Lee's attorney "specifically questioned his [own] expert . . . about this matter." What Lee's counsel asked his expert about was the expert's qualifications and experience. Dr. Brant-Zawadzki explained, in answering that inquiry, that the hospital at which he was employed had a memory and cognitive program as part of its Neuroscience Institute. Lee's attorney followed up by asking, "And actually the . . . Institute has some relationship with the NFL Players Association?" Dr. Brant-Zawadzki replied "Yeah, we were fortunate to be selected as one of the six sites in the country to evaluate former NFL players. This benefit for them arose out of the settlement between the National Football League Players Association and the NFL around the concussion issue. So as part of the settlement a trust was established which provided the players with the benefit that . . . allows them to have their brains and bodies evaluated. [¶] . . .[T]hink of it as an executive physical that includes cognition as well as physical evaluation for these players." Lee's attorney then offered Dr. Brant-Zawadzki as an expert "in the area of neuroradiology and cognitive disorders," and he was accepted as such.

Schreiber additionally claims Lee invited any error by "discuss[ing] the NFL testimony . . . in closing." But at that point, all Lee's attorney could do was try to neutralize the error that had already occurred, and she briefly referenced the NFL commentary in discussing the differences in the opinions of Dr. Barakos and Dr. Brant-Zawadzki, stating: "We heard about the NFL several times in connection with this case. And Dr. [Brant-Zawadzki's] hospital, as you heard, obviously has a contract with the Players Association to evaluate players in connection with the concussion issues that are facing the NFL. [¶] What is being presented in this case is very different from what is being presented in the NFL. We are talking about two mild concussions seven years apart. Yes, [Schreiber] is . . . an older individual, but it is not the same kind of repeated constant trauma that takes place for an NFL player over the course of what is likely decades of playing football." This argument did not "invite" any error.

However, turning to whether the error in allowing repeated references to NFL player head injuries was prejudicial, we must again conclude, for a number of reasons, it was not.

The court sustained several of Lee's objections, including his objections to the most extensive commentary. Indeed, the court sustained four of his six objections in this regard and also ordered the responses stricken in two instances. It also instructed the jury, "If I sustained an objection to a question, ignore the question and do not guess as to why I sustained the objection. If the witness did not answer, you must not guess what he or she might have said. If the witness already answered, you must ignore the answer." We must presume that the jurors understood and followed this instruction. (*People v. Hernandez* (2011) 200 Cal.App.4th 953, 969.)

19

As we have recited, the court stated several times that the commentary about the NFL player head injuries should not be construed to mean that Schreiber sustained the same type of injury. For example, the court stated, "So this is a general question. It doesn't have to do with this case at all." And it later stated, "So in this case I've sustained your objection to the NFL players several times. This time I'm going to overrule it because I'm not suggesting that . . . we have anything that's comparable here to an NFL-type injury. What I'm interested in finding out is whether he has scientifically some additional evidence in the way of actual physical studies of the brain to show that this stress that the doctor's testified today about is, in fact, true."

Lee also either failed to object, or failed to move to strike, several of the improper references to NFL player injuries.[8] And while Lee complains the trial court failed to "exclude further references" to NFL player head injuries, he never asked the court to so instruct counsel and witnesses.

The damage awards also indicate it is not reasonably probable the improper commentary about NFL player head injuries impacted the verdict. As we have discussed, Schreiber's attorney argued in closing that Schreiber had suffered a disabling brain injury that would "impact her for the rest of her life, and it impacts her where she has no control or very little control of her emotional responses to everyday stimulation." According to her attorney, Schreiber "now has to walk around and have these horrible emotional episodes. And they're horrible. I mean, no one wants to act like this. No one

_____

[8] In his reply brief, Lee asserts for the first time, that the trial court committed judicial misconduct and therefore the lack of an objection "is not a waiver if the misconduct was too serious to be cured by an admonition." "Arguments raised for the first time in the reply brief are untimely and may be disregarded," and we will not consider this belated argument here. (*WorldMark, The Club v. Wyndham Resort Development Corp.* (2010) 187 Cal.App.4th 1017, 1030, fn. 7.)

wants to alienate people. And [Schreiber] does. She cannot help herself at this point." He then urged the jury to award over $2.53 million in economic damages and $5 million in noneconomic damages, for total damages of over $7.5 million. Given that the jury awarded Schreiber a little over $2.63 million in total damages, we cannot conclude that it is reasonably probable the improper references to NFL player head injuries factored into the outcome at trial.

### D. Failure to Instruct on Schreiber's Potential Bias Against Lee

Lee and Golden Prosperities also claim the trial court erred in refusing to instruct the jury with CACI No. 217. This instruction provides: "You have heard evidence that there was a settlement between [settling parties]. You must not consider this settlement to determine responsibility for any harm. You may consider this evidence only to decide whether [settling party] is biased or prejudiced and whether [his/her] testimony is believable." (CACI No. 217.)

"A party is entitled to request that the jury be instructed correctly on any of the party's theories of the case that are supported by substantial evidence." (*Douglas v. Fidelity National Ins. Co.* (2014) 229 Cal.App.4th 392, 408.) We review the denial of a jury instruction de novo.[9] (*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc.* (2010) 188 Cal.App.4th 401, 418.) "A refusal to instruct the jury is reversible error if it is probable that the error prejudicially affected the verdict." (*Douglas*, at p. 408.)

---

[9] Schreiber erroneously maintains the standard of review is abuse of discretion, claiming Lee's "argument is at its core an evidentiary dispute," and Evidence Code "section 352 requires this Court to review the trial court's decision only for abuse of discretion." The court, however, admitted evidence of the settlement agreement, and that admission is not challenged on appeal.

21

Schreiber was deposed about a year before her settlement with the Lee children, and at the time, Lee was not named as an individual defendant. Her deposition testimony was to the effect that Lee " 'went into the background' " as far as " 'managing the property' " when " 'the [Lee] children took over' " about ten years earlier, around 2005. She also agreed that "from a management standpoint at the property [she dealt] mostly with Peter Lee."

Schreiber thereafter added Lee as a defendant. At trial, Schreiber testified that, although Lee became less active in managing the property around 2005, she "always went to [Lee]" if she needed something because "Peter [Lee] was terrible with me from the beginning."

Lee then sought admission of evidence of the settlement with the Lee children and requested the jury be instructed with CACI No. 217, asserting Schreiber's testimony regarding who was primarily managing the property changed between her deposition, when Lee was not a party, and trial, when Lee was a party and the Lee children had settled. Lee's counsel maintained: "There's a bias issue . . . in terms of what her testimony was at the time that she gave her . . . testimony, her testimony is geared to enhancing the focus on the people who she's suing."

The trial court allowed an evidentiary stipulation as to the date of the settlement and the identity of the parties who settled. It refused, however, to instruct the jury with CACI No. 217, instead instructing with CACI No. 3926. That instruction stated: "You have heard evidence that Marthe Schreiber has settled her claim against Stephen K. Lee Enterprises, Peter Lee, Gordon Lee, Shacuan Sharon Lee Seto, Anne Lee, Eva Wong, and Patricia Lum. Any award of damages to Marthe Schreiber should be made without considering any amount that she may have received under this settlement. I will make the proper deduction from any award of damages."

22

The court explained, "giving the instruction on bias and prejudice as to Ms. Schreiber would be more prejudicial than probative, and I'm not going to give it at this time. [¶] . . . I think if I give this instruction at this time, the spotlight will be focused on Ms. Schreiber, and it'll be detrimental to her position. I don't know what the Lees are going to say when they start to testify. So they can potentially testify in a way that I could get a request to give the instruction as to them. I don't know. It might be that way. [¶] I'm not necessarily precluding or saying that I wouldn't give the instruction again. I'd have to see what Ms. Schreiber testifies. I mean, right now you don't have really terrific impeachment of her. If we have some other evidence that comes in, maybe I'd reconsider giving it. But as long as she's fairly consistent with her deposition testimony, I'm not going to give the instruction. I think it's apt to have a very powerful effect if I give this. So that's the ruling right now."

We need not, and do not, decide whether the trial court erred in refusing to give the requested instruction. Even assuming the instruction should have been given, defendants' assertion of bias, based on supposed differences between Schreiber's deposition and trial testimony, is not borne out by the record. Schreiber testified at trial that, although Lee was less active in the management of the property, she preferred to contact him about property issues, rather than one of his sons. Lee's testimony was not to the contrary. He testified that, although he stepped back from active management, he continued to perform some tasks. For instance, he contacted Schreiber in 2015 about a neighbor's complaint that she had left the water running. In fact, in closing argument, Lee's counsel stated, "When it comes down to the management of 71 Water Street, there actually isn't very much of a dispute." We therefore cannot say that had the instruction

23

been given, it is reasonably probable the outcome would have been more favorable to defendants.

### E. Evidence of Lee Family Financial Assets

Lee and Golden Prosperities additionally claim the trial court erroneously allowed evidence related to the "Lee Family's wealth [and] corporate interests."

Lee filed two motions in limine concerning Lee family financial assets. One sought to exclude "any evidence of the financial conditions of plaintiff or defendants." The court granted that motion, stating "No evidence of value of any property or overall value of Lee's holdings can be introduced into evidence. No mention of his wealth or holdings in opening statement. None at all. It's without prejudice to your showing that he had other properties for other issues, such as a showing of control. That's without prejudice. You can show that. But if you do it, you could only—you could use it for control only. . . . Not a word about what his overall—what he's overall worth."

The second motion in limine sought to exclude any evidence of Lee family LLCs, receiverships, or lawsuits involving Lee family members. The court ruled, "That's a grant. No mention of it at all. No mention in opening statement. It can be introduced for the purposes of cross-examination on witnesses if you need it."

Defendants maintain that despite these rulings, the court allowed references to Lee family assets and businesses. They point to the testimony of Lee's daughter and a declaration she prepared regarding the family businesses. The court allowed this evidence, over Lee's objection, on the ground it went to the issue of whether Lee personally controlled the premises, and it read the bulk of the declaration to the jury, as follows: " 'My father, who was the general contractor, built the subject property and has served as

24

chairman and manager for the entire' [¶] 'Lee family portfolio [that] he and my mother built.' [¶] . . . [¶] 'The subject property was originally owned by [Lee and his wife] as Stephen K. Lee Enterprises. In 1987 and 1988, my father and mother transferred ownership to their subject property to their six children in equal shares. . . . The six children now own the subject property as tenants in common with each having an undivided one-sixth interest.' [¶] . . . [¶] 'On October 1, 2005, the six of us and our father formed Golden Prosperities Management Company. . . . I'm a member of Golden Prosperities as are my siblings, and I've been a member since 2005. The purpose of forming Golden Prosperities was the management of this and other business entities that generally owned real property and/or securities, which are owned by some or all of the members and have agreed to be managed by the company.' [¶] . . . [¶] 'Originally my father served as manager for . . . most of the properties from his own office. And that Peter [Lee] . . . was the manager up until about 2014.' [¶] . . . [¶] 'Golden Prosperities has managed the entire Lee family portfolio since it's formation. One of the properties to be managed by Golden Prosperities was and is the subject property. Golden Prosperities takes management fees from all the entities in the Lee family portfolio including the subject property. . . . [¶] . . . [¶] 'In approximately 2007, we, Golden Prosperities, hired my brother, Peter Lee, to work with my father in the office beginning with bookkeeping and gradually helping with the management of the various properties. Golden Prosperities paid Peter a salary for the services. Peter acted as the manager until 2014, when we lost confidence in Peter's ability to properly manage the property.' "

Defendants claim it was "undisputed the Lee children owned the property at the time of the incident . . . [and therefore] any minimal probative

25

value this prejudicial information may have had as to their investments was eliminated once they no longer remained parties to the case." (Italics omitted.) To the contrary, "a defendant who lacks title to property still may be liable for an injury caused by a dangerous condition on that property if the defendant exercises control over the property." (*Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1158.) " '[I]n identifying the party vulnerable to a verdict, control dominates over title. "The crucial element is control." ' " (*Id.* at p. 1159.) "Those who own, possess, or control property generally have a duty to exercise ordinary care in managing the property in order to avoid exposing others to an unreasonable risk of harm." (*Annocki v. Peterson Enterprises, LLC* (2014) 232 Cal.App.4th 32, 37.)

Thus, one of Schreiber's principal claims at trial was that regardless of who held record title to the property, the party who actually controlled and managed it was Lee, himself. Accordingly, in closing argument, Schreiber's counsel relentlessly argued Lee pulled the strings and ultimately exhorted the jury to find him "100-percent responsible" for Schreiber's injuries. In addition, whether Lee controlled the property was relevant to his statute of repose defense. As the jury was instructed, to succeed on that defense, Lee had to prove that "At the time of the incident, [he] did not control the skylight." Accordingly, "control" remained a central issue throughout the trial.

The declaration did make reference to the " 'entire' [¶] . . . [¶] 'Lee family portfolio' " and to " 'other business entities that generally owned real property and/or securities' "—facts fairly far afield from who actually controlled and managed the apartment property. However, while this evidence suggested the Lee family owned substantial assets, it did not reveal Lee's or the Lee family's net worth or financial assets as a whole. Thus,

26

defendants have not demonstrated that this evidence was more prejudicial than probative.

Defendants next point to testimony by William Stephen Wilson, Schreiber's expert witness on "real estate law including real estate management companies as well as on deeds."

Wilson explained that, among other things, he reviewed the minutes of Golden Prosperities' board meetings, and he testified without objection that the company managed over a dozen buildings consisting of approximately 300 dwelling units and a parking garage. According to Wilson, this made Golden Prosperities a "middle-tier management company," which, in turn, meant it should have "[p]roperly written, generally lawyer-reviewed minutes that have a preset agenda, that have an orderly discussion of issues, that contain supporting information on which decisions can be based, and then formal votes on each of these issues." Wilson then testified that instead of being proper minutes, "the minutes [of Golden Prosperities] 'read like the notes of a family therapist,' " and indicated "Lee, and his family, paid 'relatively little attention . . . to the condition of the properties or needs of [their] tenants,' but instead [focused] on who had 'control over the bank accounts.' "

Defendants complain about Wilson's reference to "the hundreds of residential units the Lee family owned, as well as commercial properties" and his commentary on the state of Golden Prosperities' minutes. However, defendants made no objection to this testimony and therefore forfeited any complaint about it on appeal. (See *People v. Pearson* (2013) 56 Cal.4th 393, 438; *People v. Dykes* (2009) 46 Cal.4th 731, 756.)

Moreover, even if the trial court abused its discretion in allowing the testimony, any error was not prejudicial. None of the complained of testimony directly related to Lee's or the Lee family's overall wealth, and, as

27

previously discussed, the jury did not award Schreiber close to the amount of damages she claimed. Defendants therefore have not shown it is reasonably probable the outcome would have been more favorable to them had these snippets of testimony been excluded.

### F. Alteration of Special Verdict Form During Deliberation

Lee additionally complains about a modification the trial court made to the special verdict form while the jury was deliberating. Specifically, the court altered the form by adding, as to the Lee children, an option for the jury to allocate their percentage of fault either on the basis of their ownership of the property, or on the basis of their status as "agent[s] or employee[s]" of Golden Prosperities. The jury found the Lee children liable only as owners.

Lee maintains the trial court erred because it did not accompany this change in the verdict form with any instructions on the liability of the Lee children as members of Golden Prosperities. He also asserts "the jury was not asked to answer questions which would allow it to find the Lee Children individually liable as members of [Golden Prosperities]." These errors supposedly "precluded the jury from allocating any fault to the Lee Children as members of [Golden Prosperities]," (italics omitted) causing the verdict form to be "hopelessly ambiguous" and "ensuring Lee was allocated a substantial, and unsupported, percentage of fault."[10]

However, the court instructed the jury on the requirements for finding the Lee children and/or Golden Prosperities negligent in allowing an unsafe condition on the property. That instruction provided in part: "Golden Prosperities . . . and/or [the Lee children] was negligent in the use or maintenance of the property if: [¶] 1. A condition on the property created an

[10] This claim of error does not, of course, pertain to Golden Prosperities.

28

unreasonable risk of harm;  [¶] 2. Golden Prosperities . . . and/or [the Lee children] knew or, through the exercise of reasonable care, should have known about it; and  [¶] 3. Golden Prosperities . . . and/or [the Lee children] failed to repair the condition, protect against harm from the condition, or give adequate warning of the condition."  The court also instructed the jury that "After a tenant has taken possession, a landlord must take reasonable precautions to prevent injury due to any unsafe condition in an area of the premise under the landlord's control if the landlord knows or reasonably should have known about it."

As to the personal liability of an officer or director of a company, the court instructed:  "Generally, a director or officer of a corporation cannot be held personally liable for the negligence of the corporation.  However[,] a director or officer can be held personally liable for damages caused to [a] person or entity if that director or officer specifically authorized, directed, or participate[d] in the allegedly tortious conduct; or that although they specifically knew or reasonably should have known that some hazardous condition or activity under their control could injur[e] plaintiff, they negligently failed to take or order appropriate action to avoid the harm."  The court also instructed the jury that "A corporation is responsible for harm caused by the wrongful conduct of its employees or agents while acting within the scope of their authority."

These instructions, as a whole, provided sufficient guidance to the jury to determine whether the Lee children were liable for the condition of the property as members or officers of Golden Prosperities.  Accordingly, Lee cannot demonstrate any error in amending the special verdict form to give the jury the option of finding them liable and allocating fault to them on that basis or on the basis of their ownership of the property.

29

### G. *Settlement Credit*

Lee and Golden Prosperities lastly claim the trial court erred in providing a settlement credit only as to economic damages and not as to noneconomic damages. This is a significant issue, as a credit against both the economic and noneconomic damages would result in a zero net judgment given the size of the pre-trial settlement. (See *Syverson v. Heitmann* (1985) 171 Cal.App.3d 106, 110, abrogated by statute on another ground as stated in *Goodman v. Lozano* 47 Cal.4th 1327, 1330.)

As we explain, this is not a typical Proposition 51 case, where all defendants faced joint and several liability for economic damages, but only several liability for noneconomic damages in accordance with their percentages of fault. Here, the settling defendants faced joint and several liability not only for the entirety of the economic damages but also for that portion of the noneconomic damages attributable to a defendant for which they faced imputed liability, as well as several liability for that portion of the noneconomic damages attributable to their own negligence. As a result, a different settlement credit analysis is required from that employed in the usual Proposition 51 case. Under this analysis, Golden Prosperities is entitled to a full settlement credit, but Lee is not.

To recap the salient facts, the Lee children, who owned the property, settled with Schreiber before trial for $2.5 million. The jury subsequently found Schreiber sustained past and future damages totaling just over $2.6 million. It also apportioned fault, allocating 12 percent to Schreiber, 54 percent to Lee (as the developer of the property), 16 percent to Golden Prosperities, and 18 percent collectively to the Lee children (as the owners of the property). Thus, taking into account Schreiber's own comparative fault,

the jury found she was entitled to recover $2.3 million—an amount she had already recovered in full through the settlement.

In resolving the settlement credit issue before us, we first examine the nature of the liability the Lee children faced as the owners of the property. Specifically, the question is whether the Lee children would have been entitled to the benefit of Proposition 51's limitation on liability for noneconomic damages. (*See Rashtian v. BRAC-BH, Inc.* (1992) 9 Cal.App.4th 1847, 1851–1852 [first examining the nature of a vehicle owner's liability for the negligence of a permissive driver in determining whether Proposition 51 applied].)

*Henry v. Superior Court* (2008) 160 Cal.App.4th 440, 448–450 (*Henry*), nicely summarizes the backdrop against which Proposition 51 was enacted: " 'Under well-established common law principles, a negligent tortfeasor is generally liable for all damage of which his negligence is a proximate cause. . . . A tortfeasor may not escape this responsibility simply because another act—either an "innocent" occurrence such as an "act of God" or other negligent conduct—may also have been a cause of the injury.' (*American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 586 . . . (*American Motorcycle*).) [¶] 'In cases involving multiple tortfeasors, [this] principle . . . has commonly been expressed in terms of "joint and several liability." ' " (*Henry,* at p. 448, quoting *American Motorcycle,* at p. 586.)

"In *American Motorcycle* the Court concluded its adoption of principles of comparative negligence in *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 . . . , which eliminated the all-or-nothing doctrine of contributory negligence, 'does not warrant the abolition or contraction of the established "joint and several liability" doctrine; each tortfeasor whose negligence is a proximate cause of an indivisible injury remains individually liable for all compensable damages

31

attributable to that injury.' (*American Motorcycle*, [*supra*, 20 Cal.3d] at p. 582.) However, to minimize the hardship on defendants from such a rule, 'the *American Motorcycle* court held (1) that plaintiffs should no longer have the unilateral right to determine which defendant or defendants should be included in an action and that defendants who were sued could bring other tortfeasors who were allegedly responsible for the plaintiff's injury into the action through cross-complaints [citation], and (2) that any defendant could obtain equitable indemnity, on a comparative fault basis, from other defendants, thus permitting a fair apportionment of damages among tortfeasors.' "[11] (*Henry, supra*, 160 Cal.App.4th at p. 449, quoting *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1197.)

Such "doctrinal advances went a considerable distance toward ensuring an injury caused by two or more tortfeasors would be apportioned according to their respective shares of comparative responsibility. Nonetheless, joint and several liability imposed on the remaining defendants the risk of paying more than their proportionate share if one or more tortfeasors liable for the plaintiff's damages were insolvent or otherwise unavailable to respond to a judgment. (See *Evangelatos v. Superior Court, supra*, 44 Cal.3d at p. 1199

---

[11] "[A]lthough *American Motorcycle* referred to ' "concurrent tortfeasors," ' . . . , the term properly refers to both concurrent and successive tortfeasors: '[I]t matters not whether the tortfeasors acted in concert to create a single injury, or successively, in creating distinct and divisible injury.' ([*Blecker v. Wolbart* (1985) 167 Cal.App.3d 1195,] 1200, fn. 2, 1203 [,abrogated by statute on other grounds as stated in *Henry v. Superior Court*, *supra*, 160 Cal.App.4th at p. 452]; see *BFGC Architects Planners, Inc. v. Forcum/Mackey Construction, Inc.* (2004) 119 Cal.App.4th 848, 852 . . . ['[J]oint and several liability in the context of equitable indemnity is fairly expansive. . . . [I]t is not limited to "the old common term 'joint tortfeasor". . . .' 'It can apply to acts that are concurrent or successive, joint or several, as long as they create a detriment caused by several actors.']. . . .)" (*Henry, supra*, 160 Cal.App.4th at p. 453.)

['[a]lthough these various developments served to reduce much of the harshness of the original all-or-nothing common law rules, the retention of the common law joint and several liability doctrine produced some situations in which defendants who bore only a small share of fault for an accident could be left with the obligation to pay all or a large share of the plaintiff's damages if other more culpable tortfeasors were insolvent'].)" (*Henry, supra,* 160 Cal.App.4th at pp. 449–450.)

"To ameliorate this 'inequity and injustice,' at least in part, in 1986 the California electorate passed Proposition 51." (*Henry, supra,* 160 Cal.App.4th at p. 450, citing *DaFonte v. Up–Right, Inc.* (1992) 2 Cal.4th 593, 599 (*DaFonte*).) Civil Code section 1431.2, subdivision (a), thus, provides: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."[12] Accordingly, " 'Proposition 51 . . . retains the joint liability of all tortfeasors, regardless of their respective shares of fault, with respect to all objectively provable expenses and monetary losses,' but

---

[12] "Economic" damages encompass all "objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities." (Civ. Code, § 1431.2, subd. (b)(1).) "Non-economic" damages are such "subjective, non-monetary losses [as] . . . pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." (*Id.*, § 1431.2, subd. (b)(2).)

'the more intangible and subjective categories of damage [are] limited . . . to a rule of strict proportionate liability.  With respect to these noneconomic damages, the plaintiff alone now assumes the risk that a proportionate contribution cannot be obtained from each person responsible for the injury.' " (*Henry, supra*, 160 Cal.App.4th at p. 450, quoting *DaFonte,* at p. 600.)

However, even in cases seeking recovery for personal injury, property damage, or wrongful death, there are some contexts in which Proposition 51 does not limit a defendant's liability for noneconomic damages.  A number of courts have held Proposition 51 inapplicable where liability is imposed on a defendant solely because of his or her relationship with a co-tortfeasor, or because of statutory mandate or legal principle, and not because the defendant acted in a manner that caused or contributed to the plaintiff's injury—that is, when liability is " 'imputed,' " rather than based on actual fault or culpable conduct.  (*Henry, supra*, 160 Cal.App.4th at pp. 458–459; see *Rashtian, supra*, 9 Cal.App.4th at p. 1851 [Proposition 51 cannot "as a matter of logic or common sense, be applied to those who are without fault and only have vicarious liability by virtue of some statutory fiat"].)

For example, in *Miller v. Stouffer* (1992) 9 Cal.App.4th 70, 85 (*Miller*), the court concluded, "Proposition 51 does not shield a vicariously liable employer who is liable under the doctrine of respondeat superior from liability for noneconomic damages."  The doctrine of respondeat superior "imposes liability 'irrespective of proof of the employer's fault.' [Citation.] Liability is imposed on the employer as ' "a rule of policy, a deliberate allocation of a risk." ' " (*Id*. at p. 84.)  Such " [v]icarious liability means that the act or omission of one person . . . is imputed by operation of law to another[.]' " (*Ibid*., italics omitted)  "If . . . Proposition 51 shields every defendant from liability for noneconomic damages beyond that attributable to

34

that defendant's own fault, it largely would abrogate the vicarious tort liability of persons for the acts of others. Nothing in the language or intent of Proposition 51 conveyed to the voters in June 1986 dictates such a drastic change in California tort law." (*Miller,* at p. 85; see *Rashtian, supra,* 9 Cal.App.4th at pp. 1853–1854 [Proposition 51 not applicable where vehicle owner's liability is not based upon culpability, but on status as owner pursuant to permissive user statute].) In effect, "vicariously liable defendants are viewed, for policy reasons, as a single entity." (*Arena v. Owens–Corning Fiberglas Corp.* (1998) 63 Cal.App.4th 1178, 1197 (*Arena*).)

Courts have reached the same conclusion in some products liability cases, specifically as to defendants within the same chain of distribution of a single defective product. (E.g., *Bostick v. Flex Equipment Co., Inc.* (2007) 147 Cal.App.4th 80, 93–95 (*Bostwick*); *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 628–633 (*Wimberly*); see *Arena, supra,* 63 Cal.App.4th at pp. 1193–1199 [while defendants within the same chain of distribution of a single product remain jointly and severally liable, Proposition 51 applies in asbestos cases where multiple products cause the plaintiff's injuries and the evidence provides a basis to allocate liability]; cf. *Romine, supra,* 224 Cal.App.4th at p. 1011 [observing a "split in authority of sorts has developed over Proposition 51's application to strict products liability actions"].)

In *Wimberly*, for example, the court recounted the similarities between vicarious liability and strict products liability. As the Supreme Court had observed in *Far West Financial Corp. v. D & S Co.* (1988) 46 Cal.3d 796, 813, footnote 13: " 'In many instances—for example, strict product liability—tort law places "direct" liability on an individual or entity which may have exercised due care in order to serve the public policies of a fair allocation of

the costs of accidents or to encourage even greater safety efforts than are imposed by the due care standard. [Citation.] As a leading text on torts explains, the modern justification for vicarious liability closely parallels the justification for imposing liability on the nonnegligent manufacturer of a product: "What has emerged as the modern justification for vicarious liability is a rule of policy, a deliberate allocation of risk. The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. They are placed upon the employer because, having engaged in an enterprise, which will on the basis of all past experience involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large." ' " (*Wimberly*, *supra*, 56 Cal.App.4th at p. 630, italics omitted.) *Wimberly* thus concluded, "Proposition 51 has no application in a strict product liability case" because liability is not based on comparative fault. (*Id.* at p. 633.)

The courts have similarly concluded Proposition 51 does not apply where a property owner's liability is based on the doctrine of "nondelegable duty." "Under this doctrine, a landlord cannot escape liability for failure to maintain property in a safe condition by delegating such duty to an independent contractor. [Citations.] Simply stated, ' "[t]he duty which a possessor of land owes to others to put and maintain it in reasonably safe condition is nondelegable. If an independent contractor, no matter how carefully selected, is employed to perform it, the possessor is answerable for harm caused by the negligent failure of his contractor to put or maintain the

36

buildings and structures in reasonably safe condition[.]" ' "[13]  (*Srithong v. Total Investment Co.* (1994) 23 Cal.App.4th 721, 726 (*Srithong*), quoting *Brown v. George Pepperdine Foundation* (1943) 23 Cal.2d 256, 260.)  "Thus, for example, a landlord's duty to maintain elevators in a safe condition is nondelegable (*Brown v. George Pepperdine Foundation, . . .* at p. 259 ), as is the owner's duty to maintain a water heater which is a fixture (*Knell v. Morris* (1952) 39 Cal.2d 450, 456–457 . . .), and the duty to maintain and repair a roof or other portions of the premises over which the landlord retains possession and control.  (*Poulsen v. Charlton* [(1964)] 224 Cal.App.2d [262,] 268.)"  (*Srithong,* at p. 726.)

Srithong accordingly concluded "the nondelegable duty rule is a form of vicarious liability because it is not based on the personal fault of the landowner who hired the independent contractor."  (*Srithong, supra,* 23 Cal.App.4th at p. 727.)  Rather, "the party charged with a nondelegable duty is 'held liable for the negligence of his agent, whether his agent was an employee or an independent contractor' "—the rationale being "there will be a financially responsible defendant available to compensate for the negligent harms caused by that defendant's activity" (i.e., the ownership of commercial property).  (*Ibid.*, italics omitted, quoting *Maloney v. Rath* (1968) 69 Cal.2d 442, 446, abrogated by statute on other grounds as stated in *SeaBright Ins. Co. v. US Airways, Inc.* (2011) 52 Cal.4th 590, 602.)  The commercial property owner in *Srithong* was therefore not entitled to the benefit of Proposition 51's

---

[13]  The Restatement of Torts, section 422 likewise provides:  "A possessor of land who entrusts the repair of a building or other structure thereon to an independent contractor is subject to the same liability to persons within or outside the land who are injured by the contractor's negligent failure to put or maintain the building or structure in reasonably safe condition as though he had retained the making of the repairs in his own hands."

limitation on noneconomic damages, but rather was "fully liable for" the negligence of the roofing contractor it had hired. (*Srithong,* at p. 728; accord *Koepnick v. Kashiwa Fudosan America, Inc.* (2009) 173 Cal.App.4th 32, 35 [owner of commercial building fully liable for negligence of elevator contractor].)

Accordingly, in cases where one of several defendants is vicariously liable for the wrongful conduct of another, the court must, in entering judgment, take into account that Proposition 51 does not apply to the vicariously liable defendant.[14] In cases where there are only two defendants, one of which is vicariously liable for the negligence of the other, sorting out the extent of liability for purposes of entering judgment is straightforward— the vicariously liable defendant is jointly and severally liable for the entirety of both the economic and noneconomic damages, while the negligent defendant is also jointly and severally liable for the economic damages, but only severally liable for its proportional share of the noneconomic damages.

The situation is more complicated where, in addition to two defendants of the sort described above, there are additional tortfeasors whose acts contributed in some way to the plaintiff's injury. In *Miller*, the court addressed this situation after concluding a vicariously liable employer cannot seek the protection of Proposition 51 to avoid liability for an employee's negligence. This does not mean, said the court, that a vicariously liable defendant is wholly deprived of the benefit of Proposition 51—a vicariously liable employer "does enjoy the benefit of Proposition 51 in that the employer's liability for noneconomic damages is restricted to the percentage

---

[14] As have prior cases, we use the term "vicariously liable" broadly to include those circumstances in which liability is imputed, rather than based on the defendant's own wrongful conduct.

of fault allocated to its employee." (*Miller, supra*, 9 Cal.App.4th at p. 84.) Thus, "had [the plaintiff] also sued another motorist, a public entity, or a vehicle manufacturer, under Proposition 51 [the employer] would have been shielded from liability for noneconomic damages beyond those attributable to . . . her own employee." (*Ibid.*)

Citing *Miller*, a leading treatise on personal injury law, California Practice Guide: Personal Injury, states: "[I]f both employee and employer are joined as defendants (employee on a direct negligence theory and employer solely on a vicarious liability theory) *along with other defendants* whose fault is being compared, *as between employer and employee,* they would be *jointly and severally* liable for the employee's share of noneconomic damages according to the employee's fault (as well as for the employee's full joint and several economic damages liability)." (Haning, Flahavan, Cheng & Wright, Cal. Practice Guide: Personal Injury (The Rutter Group 2019), ¶ 2:618, p. 2(II)-3.)

This treatise further observes, "There may be cases where the employer can be sued on *other* theories as well—e.g., negligent entrustment, negligent supervision or perhaps negligent hiring. If there is an *independent* basis for holding the employer liable, it will usually be to the plaintiff's advantage to plead *both* the respondeat superior *and* independent liability theories. Reason: In multidefendant cases, the trier of fact will have to make a separate determination of what percentage of fault is attributable to the employer under the *independent* theory; the employer, in turn, will be liable for that protion of noneconomic damages resulting from *both* the fault allocated to the employee *and* the fault allocated to the employer on the independent theory." (*Id.*, ¶ 2:619, at p. 2(II)-4.) The treatise then provides the following example: "In a multi-defendant work-related injury case, it is

39

determined that Defendant A is 10% at fault, Defendant B (Employee) is 70% at fault, and Defendant C (Employer) is 20% at fault (on a theory of negligent supervision of Employee). Employer, who presumably has the 'deepest pockets,' could be reached for 90% of the noneconomic damages (70% on the vicarious liability theory, plus 20% on the negligent supervision theory)." (*Ibid.*)

The foregoing discussion leads to the following conclusions as to the nature, and extent, of the liability faced by the Lee children. As the owners of a commercial property, they not only faced liability for their own negligence, they also faced imputed liability, under the nondelegable duty doctrine, for any wrongdoing on the part of persons and entities assisting them in the care and management of their property. They therefore faced liability for both their own negligent acts and the acts of their property manager, Golden Prosperities.

They did not, however, face imputed liability for Lee's conduct as the developer of the property, including his constructing the defective sky light. They are, as the owners of the property, and as Lee points out, wholly responsible for maintaining the property in a reasonably safe condition and correcting, or warning of, dangerous conditions thereon, including pre-existing conditions they did not create. However, they are not liable beyond the confines of a traditional tort analysis. Rather, their liability as owners to maintain and repair is predicated on a duty of care that extends not to any dangerous condition, but to dangerous conditions of which they are aware or reasonably should be aware. (See *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205–1207 [duty to exercise reasonable care encompasses only conditions known to the possessor of premises or which the possessor should reasonably discover, and only conditions the possessor should realize create

an unreasonable risk of injury]; *Alcarez v. Vece* (1997) 14 Cal.4th 1149, 1156–1159 [possessor's duty to maintain property in reasonably safe condition arises regardless of whether possessor creates the dangerous condition]; see generally 6 Miller & Starr, Cal. Real Estate (4th ed. 2019) § 19:53, pp. 19-245–19-247 [landlord has affirmative duty to maintain premises in a reasonably safe condition and this duty includes an inspection to discover any dangerous condition that can be reasonably discovered].)  In short, in contrast to the vicarious liability the Lee children bore for any acts of their property manager under the nondelegable duty doctrine, they were not liable, regardless of their own fault (i.e., their own duty of care and breach thereof), for Lee's development and construction work.

As a consequence of the nature of their liability, the Lee children were not entitled to the full benefit of Proposition 51, and they faced joint and several liability not only for all of Schreiber's economic damages, but also for Golden Prosperities' share of her noneconomic damages, as well as several liability for their own proportional share of those damages.  Thus, using the jury's allocation to illustrate, had the Lee children proceeded to trial, they would have been liable for all of Schreiber's economic damages and also for 34 percent of her noneconomic damages (based on the 18 percent of fault allocated to them, plus the 16 percent of fault allocated to Golden Prosperities).  They would, however, have received the benefit of Proposition 51 as to Lee, who was found individually liable solely on the basis of his prior ownership and development of the property (and not as a participant in Golden Prosperities).

Having determined the nature and extent of the Lee children's potential liability, we turn to the question of how their pretrial $2.5 million settlement should be credited.

41

The courts have long recognized that when Proposition 51 applies, nonsettling defendants are entitled to a settlement credit as to economic damages, but not as to noneconomic damages. (*Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 275–276.) The rationale for this is as follows: Because Proposition 51 limits a tortfeasor's liability for noneconomic damages to his or her *own* proportional share of these damages, "a personal injury plaintiff's valid 'claim' against one such tortfeasor for noneconomic damages can never be the liability of 'the other[]' [tortfeasors]." (*Id.* at p. 274.) Accordingly, "[t]he payment of such a claim by one tortfeasor is not the payment of a claim for which 'the other[]' [tortfeasors] might ever be held jointly and severally liable." (*Id.* at pp. 274–275.)

In other words, when a defendant entitled to the full benefit of Proposition 51 settles, he or she is resolving, with respect to noneconomic damages, only his or her *own* share of those damages. (See generally Cal. Practice Guide: Personal Injury, *supra*, ¶ 4:85, at p. 4-11; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2019), ¶ 12:775, p. 12(II)-73.) And nonsettling defendants cannot look to that payment as resolving, in whole or in part, *their* proportional shares of those damages.

This is so even when a defendant entitled to the full benefit of Proposition 51 overestimates his or her share of fault and "overpays" to resolve his or her share of the plaintiff's noneconomic damages. (*Hoch v. Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48, 65–67 (*Hoch*).) Rather, as to noneconomic damages, the parties must live with the bargain they struck. "If the settlement was 'low,' the plaintiff loses; he or she cannot recover the difference in noneconomic damages from the remaining defendants. If the settlement was 'high,' . . . the plaintiff wins; he or she retains the benefit of

the settlement bargain as well as receiving the amounts allocated by the jury to the nonsettling defendants. The nonsettling defendants bear no risk and can reap no benefit from divergence; the settlement does not affect their liability for noneconomic damages." (*Id.* at p. 65.) Or stated another way, because the plaintiff bears the risk of recovery as to noneconomic damages (by having to look to each tortfeasor to fully recover these damages where Proposition 51 applies), equity dictates that the plaintiff "also be entitled to retain the benefit of [his or her] bargain when the settlement is generous" (i.e., where the settling defendant overestimates its degree of fault and overpays to settle its share of the noneconomic damages). (*Id.* at p. 66.)

However, the fundamental predicate of the *Espinoza/Hoch* analysis—that the settling defendant is only severally liable for noneconomic damages and thus is resolving only his or her own proportional share of those damages—is absent where, as here, the settling defendant is not entitled to the full benefit of Proposition 51 and continues to face joint and several liability for some or all of the plaintiff's noneconomic damages. In this situation, the settling defendant must resolve not only his or her own proportional share of those damages (based on the settling defendant's own negligence), but also the share of those damages for which he or she is vicariously liable. In short, when a vicariously liable defendant settles, he or she is in a sense "pre-paying," in whole or in part, the liability of the defendant for whom the settling defendant is vicariously liable.

The conclusion that naturally follows is that full credit for such a settlement must be given to the defendant for whom the settling defendant bears imputed liability. Proposition 51 is not an impediment to such credit because, as we have discussed, it does not apply to a settling tortfeasor to the extent he or she bears imputed liability to the plaintiff. The equitable issue

43

addressed in *Hoch* likewise does not exist because the plaintiff and the vicariously liable defendant bargain to resolve a liability that exceeds the latter's own proportion of fault.

A credit for both economic and noneconomic damages in this context also fulfills the longstanding acknowledgment embedded in our law outside of Proposition 51, that a settlement, while not releasing other tortfeasors, reduces their liability by the amount of the settlement. Where a settlement is determined to be in "good faith," this mandate is set forth in Code of Civil Procedure section 877, which additionally protects the settling party from any claims for contribution. (Code Civ. Proc., § 877, subd. (a); see generally *Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 301, 303–304.) Where, as here, a trial court declines to find a settlement in "good faith," a settlement credit is nevertheless required, but the settling party remains subject to claims for contribution.[15] (*Id.* at pp. 307–308.)

Ultimately, settlement credits are predicated on the principle that while a plaintiff is entitled to full compensation for his or her proven injuries, he or she is not entitled to a "double recovery" of these damages. (See *Poire v. C.L. Peck/Jones Brothers Construction Corp.* (1995) 39 Cal.App.4th 1832, 1840 [the " 'fundamental purpose' " of a settlement credit under Code of Civil Procedure section 877 " 'is to preclude a double recovery arising out of the same wrong.' "]; see also *Bostick, supra*, 147 Cal.App.4th at p. 111 ["one of the

---

[15] Several of the Lee children moved for a "good faith" settlement determination, but made a scant showing in support of their motion. Not surprisingly, the trial court denied the motion, including because they failed to carry their burden to demonstrate the extent of their liability and because several of the Lee children opposed the settlement. The dissenting members of the Lee family felt the entire case should have been resolved and believed their attorney (paid for by their insurance company) and the plaintiff's attorney had agreed to a deal not in the Lee family's best interests.

purposes of the setoff requirement . . . is to avoid an unjust double recovery"] (conc. opn. of Croskey, Acting P.J.).) "When multiple defendants are responsible for the same compensatory damages, a setoff . . . is required by the fundamental principle that '. . . a plaintiff may not recover in excess of the amount of damages which will fully compensate him for his injury.' " (*Hoch, supra,* 24 Cal.App.4th at p. 67, quoting *Jaramillo v. State of California* (1978) 81 Cal.App.3d 968, 970.) A "plaintiff cannot, by proceeding separately against each of several defendants, ' "convert a joint into a several [injury], and thereby secure more than one compensation for the same injury." ' (*May v. Miller* [1991] 228 Cal.App.3d [404,] 410, . . . .) In a case of joint liability, the damages for which each defendant is responsible to the plaintiff cannot be divided, and a settlement is rationally assumed to be intended to cover the entire damages." (*Hoch*, at p. 67.)

A vicariously liable defendant and a negligent defendant for whom the vicariously liable defendant bears liability, are responsible for the *same* damages. And while a plaintiff can look to either the vicariously liable defendant or the actively negligent defendant to pay these damages, the plaintiff cannot recover these same damages from both.

It is for this reason that Golden Prosperities is entitled to full credit for the settlement by the Lee children, since, as the owners of the property, they were jointly and severally liable for the negligent conduct of their management company. Any other outcome would result in a double recovery, with Schreiber recovering the same noneconomic damages from both the Lee children and Golden Prosperities. Proposition 51 was intended to make the tort system more equitable by eliminating the " 'deep pocket' rule" and requiring that noneconomic damages be paid by the party who is at fault for inflicting them. (*DaFonte, supra,* 2 Cal.4th at p. 599.) It was not designed to

45

allow double recovery for the same injury.  We also observe that, taking into account Schreiber's own percentage of fault, the jury found she sustained total damages of just over $2.3 million, an amount she fully recovered through her $2.5 million settlement with the Lee children.  And while Schreiber cannot recover any additional amount from Golden Prosperities, she will recover an additional $756,000 from Lee and thus receive an amount considerably in excess of the total damages found by the jury.

## IV.    DISPOSITION

The judgment as to Golden Prosperities is reversed and the trial court is directed to enter a net zero judgment.  The judgment as to Lee is affirmed.  Parties are to bear their own costs on appeal.

 

                             _____

                             Banke, J.

We concur:

_____

Humes, P.J.

_____

Margulies, J.

A149969, A150093, *Schreiber v. Lee*

47

Trial Court:  Superior Court of Francisco City and County

Trial Judge:  Hon. A James Robertson, II

Counsel:

Brent Fiol & Pratt LLP, Peter Joseph Brent, Wesley R. Pratt and David L. Fiol for Plaintiff and Respondent.

Bledsoe, Diestel, Treppa & Crane LLP, Alison McNaboe Crane, Jamie Nicolas Bernate and Jocelyn S. Koo; Berding & Weil LLP, Arthur Fredrick Hagen and Daniel Rottinghaus for Defendants and Appellants.